**Jorge TORRICO, Plaintiff,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.**

**No. 01 Civ. 841(GEL).**

United States District Court, S.D. New York.

July 31, 2002.

Timothy N. Seward, Potomac, Maryland, for Plaintiff.

John Houston Pope, Epstein, Becker & Green, L.L.P., New York City, for Defendant.

## OPINION AND ORDER

LYNCH, District Judge.

Plaintiff Jorge Torrico brought this action against defendant International Business Machines Corporation ("IBM") alleging violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.;* the Civil Rights Act of 1866, 42 U.S.C. § 1981; the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.;* and the New York Human Rights Law ("NYHRL"), N.Y. Exec. L. § 290 *et seq.* IBM moved to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(1) and 12(c), arguing that the Court lacks subject matter jurisdiction over Torrico's claims and that the complaint fails to state a claim upon which relief may be granted. Torrico has now abandoned his claims for relief under § 1981 and ERISA, and accordingly those claims will be dismissed. However, for the reasons that follow, the balance of IBM's motion will be denied.

## BACKGROUND

For purposes of this motion to dismiss, the facts must be taken as pleaded by the plaintiff. Torrico is a citizen of Chile who currently lives in Santiago, Chile. (Compl. ¶ 5.) Torrico's former employer, IBM, is a New York corporation with its principal place of business in Armonk, New York. (Compl.¶ 6.) From September 1994 until January 2000, Torrico was employed by IBM United States ("IBM US") in the position of General Manager of IBM Latin America/Telecommunications and Media Industry ("IBM LA"). (Compl. ¶ 7; Pl. Opp. to Mot. to Dismiss, Ex. 6 ("Torrico Decl.") ¶ 1.) This position was based in Mt. Pleasant, New York, with concurrent line reporting responsibilities to both the Vice President of Marketing, Services, and Line Operations of IBM LA as well as the Senior Executive Vice President of Marketing for IBM US. (Torrico Decl. ¶ 2.) In this position, Torrico was required to travel continuously between IBM LA's headquarters in Mt. Pleasant and its marketing prospects in various countries throughout Latin America, including Brazil, Argentina, Colombia, Chile, Mexico, and Peru. (Torrico Decl. ¶ 3.)

In June 1995, IBM LA and Torrico agreed to a three-year temporary rotational assignment to IBM Chile (the "Temporary Assignment"). The Temporary Assignment was conceived in order to help Torrico perform his existing professional duties more effectively by facilitating "a substantial reduction in [his] travel time and [his] response time in dealing with rapidly evolving business opportunities throughout Latin America." (Torrico Decl. ¶ 3.) According to Torrico, no aspect of his employment relationship with IBM U.S. was modified or altered by the Temporary Assignment; IBM, by contrast, maintains that upon this assignment Torrico "became an employee of IBM's subsidiary in Chile." (Torrico Decl. ¶ 4; Ans. ¶ 5.) In a letter agreement concerning the Temporary Assignment dated June 20, 1995, IBM represented that

> *[i]nternational assignments are temporary in nature.* The length of your assignment is based on present business requirements and is subject to change at the discretion of IBM. You are expected to re-enter your home country at the completion of your assignment or any extension.

(Pl. Opp. to Mot. to Dismiss, Ex. 2 ("Assignment Agreement"), at 1 (emphasis added).) IBM also represented to Torrico that since this rotational assignment was to be temporary, IBM LA "[would] be responsible for planning [Torrico's] next

position in the U.S." (Assignment Agreement at 1.)

The Temporary Assignment commenced on July 1, 1995. (Assignment Agreement at 1.) According to Torrico, upon the commencement of the Temporary Assignment he remained in all respects a U.S. employee of the Mt. Pleasant-based IBM LA. He remained on the IBM U.S. payroll and covered under the U.S. salary and benefit plans throughout the Chile assignment, as contemplated by the terms of the Assignment Agreement. (Torrico Decl. ¶ 5; Assignment Agreement at 2.) For all tax periods during that assignment, IBM withheld federal and New York income taxes and taxes for Social Security and Medicare from his salary paychecks. IBM payroll records identified Torrico's state tax jurisdiction as New York, and in accordance with IBM US's International Assignment Tax Plan, IBM calculated Torrico's federal and state taxes based on the assumption that his state of residence and work location in the United States "did not change prior to or during the assignment." (Assignment Agreement at 2–3 & attachment C; Torrico Decl. ¶ 5; Pl. Opp. to Mot. to Dismiss, Ex. 7.) Torrico's base compensation and annual bonuses during the Temporary Assignment were reviewed and determined by IBM U.S. in Mt. Pleasant. (Torrico Decl. ¶¶ 2, 5.) He also received a number of employee benefits in line with those of IBM's U.S. employees—for example, he remained covered under IBM US's benefit plan, which included his medical and dental benefits, and received "Incentive Stock Options" that only were available to U.S. executives on IBM's U.S. payroll. (Assignment Agreement, attachment E; Def. Mot. to Dismiss, Ex. 3–5.) In 1997, Torrico also was enrolled in IBM's Extended Tax Deferral Savings Plan, a plan also that was available exclusively to IBM's U.S. employees. (Pl. Opp. to Mot. to Dismiss, Ex. 4.)

Since the Temporary Assignment had line reporting responsibility directly to the IBM LA unit of IBM U.S. in Mt. Pleasant, Torrico traveled regularly to Mt. Pleasant for meetings. On average these meetings occurred every two months; IBM U.S. was responsible for all strategic, budgetary, and organizational decisions concerning the telecommunications industry marketing campaign that Torrico directed in Latin America. (Torrico Decl. ¶¶ 2, 5.) According to Torrico, he never had any direct line reporting obligations to IBM Chile or any other foreign subsidiary of IBM US. (Torrico Decl. ¶ 5.)

IBM also represented to U.S. immigration officials that Torrico was a U.S. employee. In a November 1995 letter to the Immigration and Naturalization Service, IBM verified "the *continued* employment of Mr. Jorge Torrico *with our company, IBM,*" and noted that Torrico "has been assigned to IBM Chile for a period of 3 years, beginning July 1, 1995. Following this assignment, *he will be reassigned to a position in the United States.*" (Pl. Opp. to Mot. to Dismiss, Ex. 3 (emphasis added).) Later, in July 1998, IBM Chile certified to the U.S. consulate in Santiago, Chile, that Torrico was an employee of IBM U.S. on temporary assignment to IBM Chile.[1] (Pl. Opp. to Mot. to Dismiss, Ex. 5.)

Although the Temporary Assignment had been due to end in 1998, the assignment was extended for an additional year. (Pl. Br. at 8 n. 4.) In early 1999, Torrico was advised that IBM planned to consolidate his division with another, requiring him to obtain a new position within the

---

**1.** The text of the certification states that "el Sr. Jorge Torrico Jorquera es empleado de IBM Estados Unidos y está asignado a IBM de Chile S.A.C., como Gerente General de la ISU de Telecommunicaciones y Medios, hasta el día 31 de diciembre de 1998."

company. Accordingly, Torrico began the interview process for a position with IBM's Telecommunications and Utilities Sector, U.S. Consulting Practice, in New York. (Compl. ¶ 8.) However, Torrico became very ill in January 1999 as a result of an autoimmune disease that caused, among other symptoms, severe chronic fatigue, reactive arthritis and peripheral neuropathy, and severe muscular pain throughout his body. (Compl. ¶ 9.) At one point on January 23, 1999, Torrico collapsed and required medical attention. (Compl. ¶ 8.) Torrico's physician advised him that on account of this condition, he would require rest and would not be able to work for approximately six months. (Compl. ¶ 11.) Accordingly, Torrico informed his employer of his illness and went on a medical leave of absence on January 24, 1999.

Throughout his leave of absence, Torrico informed Dr. Linda Rock, IBM's Head of Occupational Health, of his condition and the progress of his treatment. His condition improved over time, and by November 1999, Dr. Rock recommended to the General Manager of the Telecommunications and Utilities Sector that Torrico return to work on a limited basis and under a part-time schedule. (Compl. ¶ 13.) However, IBM did not follow this recommendation, and instead informed Torrico in December 1999 that since his division had been reorganized, it would be his responsibility to find another position within IBM by January 31, 2000; otherwise, he would be terminated. (Compl. ¶ 14.) Torrico therefore began again to look for a new position within IBM. Upon learning that a position was expected to open in IBM's Internet Division in March 2000, Torrico requested that his termination date be extended until March 31, 2000, in order to provide him an opportunity to be hired for that position. Torrico emphasized that his request for this accommodation resulted from his being physically incapable of working or looking for a new position within IBM

throughout much of 1999 on account of his illness, and that only recently had he been cleared by physicians to work on a limited basis. (Compl. ¶ 15–16.) He protested that the limited period of time within which IBM expected him to find a new position was discriminatory, given his illness, and that the January 2000 termination date would deprive him of highly valuable IBM stock options that had been part of his salary and benefits package and were scheduled to vest in February and March 2000. (Compl. ¶ 17.)

Notwithstanding Torrico's request, IBM refused to extend Torrico's termination date, and he was terminated—while still on medical leave—on January 31, 2000, by Khalil Barsoum, the Global Manager of Telecommunications & Utilities Industry of IBM US. (Compl. ¶ 19; Torrico Decl. ¶ 6.) Torrico filed this action *pro se* on February 2, 2001, asserting claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.;* the Civil Rights Act of 1866, 42 U.S.C. § 1981; the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.;* and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.* Counsel appeared on Torrico's behalf on January 31, 2002.

## DISCUSSION

■ Pursuant to Fed.R.Civ.P. 12(b)(1) & 12(c), IBM moved to dismiss this action for lack of subject matter jurisdiction and for judgment on the pleadings, arguing that Torrico is not within the class of individuals protected by any of the four statutes under which he has brought this action because he is a non-U.S. citizen who was working in Chile at the time his employment was terminated. Torrico has abandoned his claims under § 1981 and ERISA, and accordingly, the Court will dismiss those two claims pursuant to Fed.

R.Civ.P. 41(a)(2). And IBM now concedes that its motion is not properly treated as one challenging the Court's subject matter jurisdiction to adjudicate Torrico's claims, pursuant to Fed.R.Civ.P. 12(b)(1), since "the dispute concerns the existence of a fact ... that Congress has specified as a prerequisite for the application of a federal statute." *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 363 (2d Cir.2000). As Justice Scalia put it in *Hartford Fire Insurance Co. v. California*, 509 U.S. 764, 813, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (dissenting opinion), the question of a statute's "extraterritorial reach ... has nothing to do with the jurisdiction of the courts. It is a question of substantive law turning on whether, in enacting [the statute], Congress asserted regulatory power over the challenged conduct."

 When adjudicating IBM's motion for judgment on the pleadings under Fed. R.Civ.P. 12(c), "we apply the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." *King v. American Airlines, Inc.*, 284 F.3d 352, 356 (2d Cir.2002). The "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996) (internal quotation marks and citations omitted). While the complaint must "give[ ] full notice of the circumstances giving rise to the plaintiff's claim for relief," it is not necessary that the plaintiff "also correctly plead the legal theory or theories and statutory basis supporting the claim." *Simonton v. Runyon*, 232 F.3d 33, 36 (2d Cir.2000) (quoting *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 712 n. 4 (2d Cir.1980)); *see Brown v.*

*Oneonta*, 235 F.3d 769, 783 (2d Cir.2000) (Calabresi, J., dissenting from the denial of rehearing *en banc*) ("[A] statement of a specific legal theory is in no way needed for a pleading to survive a 12(b)(6) dismissal motion."). Moreover, "since most *pro se* plaintiffs lack familiarity with the formalities of pleading requirements, we must construe *pro se* complaints liberally, applying a more flexible standard to evaluate their sufficiency than we would when reviewing a complaint submitted by counsel."[2] *Lerman v. Board of Elections in City of New York*, 232 F.3d 135, 139–40 (2d Cir.2000). In order to justify dismissal of Torrico's *pro se* complaint, it must be "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 140 (internal quotation marks and citations omitted).

## I. Americans With Disabilities Act

Count One of the complaint claims that IBM's termination of Torrico violated Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111–12117, which makes it unlawful for any employer to "discriminate against a qualified individual with a disability because of the disability ... in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Discrimination" includes an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," unless doing so would impose "undue hardship" on the employer. 42 U.S.C.

---

**2.** While counsel now has appeared on behalf of Torrico, his complaint initially was filed *pro se*. We therefore evaluate the sufficiency of the complaint using the less stringent standard applicable to *pro se* plaintiffs. *Lerman*, 232 F.3d at 140 n. 3.

§ 12112(b)(5)(A). IBM urges dismissal of this claim, arguing that as a non-U.S. citizen on temporary assignment in Chile at the time his employment was terminated, Torrico is not protected by the ADA.

■■■ Unquestionably, Congress has the authority to regulate the conduct of U.S. employers outside the territorial jurisdiction of the United States. *See, e.g., EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) ("*Aramco*"); *see also Restatement (Third) of Foreign Relations Law of the United States* § 402(2) (a state has jurisdiction to legislate with respect to "the activities, interests, status, or relations of its nationals outside as well as within its territory"). Nevertheless, courts will "presume that Congress has not exercised this power—i.e., that statutes apply only to acts performed within United States territory—unless Congress manifests an intent to reach acts performed outside United States territory." *United States v. Bin Laden*, 92 F.Supp.2d 189, 193 (S.D.N.Y.2000); *see Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 188, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) ("Acts of Congress normally do not have extraterritorial application unless such an intent is clearly manifested."). We presume that legislation does not apply extraterritorially primarily "to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Aramco*, 499 U.S. at 248, 111 S.Ct. 1227; *see Pfeiffer v. Wm. Wrigley Jr. Co.*, 755 F.2d 554, 557 (7th Cir.1985) ("The fear of outright collisions between domestic and foreign law—collisions both hard on the people caught in the cross-fire and a potential source of friction between the United States and foreign countries—lies behind the presumption against the extraterritorial application of federal statutes."). However, the presumption against extraterritoriality does not ordinarily apply where "the failure to extend the scope of the statute to a foreign setting will result in adverse effects within the United States" or where "the conduct regulated by the government occurs within the United States." *Environmental Defense Fund, Inc. v. Massey*, 986 F.2d 528, 531 (D.C.Cir.1993).

■■■ In determining whether Congress has in fact given a statute extraterritorial effect, we consider "all available evidence about the meaning" of the statute, including its text, structure, and legislative history. *Haitian Centers Council, Inc.*, 509 U.S. at 177, 113 S.Ct. 2549; *see Smith v. United States*, 507 U.S. 197, 201–03, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993) (reviewing text, structure, and legislative history of Federal Tort Claims Act when determining its extraterritorial effect); *United States v. Gatlin*, 216 F.3d 207, 212 (2d Cir.2000). As amended by section 109 of the Civil Rights Act of 1991, Pub.L. 102–166, 105 Stat. 1071 (1991) (codified at 42 U.S.C. §§ 2000e–1(c), 12111(4), & 12112(c)), the ADA "clearly manifest[s]" Congress's intention to give the statute extraterritorial effect. That section, entitled "Protection of Extraterritorial Employment," amended the ADA's definition of "employee" to provide that "[w]ith respect to employment in a foreign country, [the] term includes an individual who is a citizen of the United States." 42 U.S.C. § 12111(4). At the same time, however, Congress limited the ADA's extraterritorial application by providing (1) that "with respect to an employee in a workplace in a foreign country," actions that would otherwise constitute discrimination are not unlawful "if compliance with [the ADA] would cause [the] covered entity to violate the law of the foreign country in which such workplace is located," 42 U.S.C. § 12112(c)(1), and (2) that the ADA does not apply to the foreign operations of a foreign corporation unless that corporation is "controlled" by a U.S. employer, 42

U.S.C. § 12112(c)(2). Section 109 enacted identical amendments to Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. §§ 2000e(f), 2000e-1(b)-(c).

■ These provisions in the ADA and Title VII contrast, for example, with the provisions of the Fair Labor Standards Act ("FLSA"), which exempts from its coverage "any employee whose services during the workweek are performed in a workplace within a foreign country." 29 U.S.C. § 213(f). Legislative history to that provision indicates that Congress concluded that application of the FLSA to foreign countries " 'is usually inconsistent with local conditions of employment, the level of the local economy, the productivity and skills of indigenous workers, and is contrary to the best interest of the United States and the foreign areas.' " *Cruz v. Chesapeake Shipping Inc.*, 932 F.2d 218, 226 (3d Cir.1991) (opinion of Rosenn, J.) (quoting Senate report). Thus, the FLSA does not apply at all to work performed in a foreign country. *See Cruz v. Chesapeake Shipping Inc.*, 738 F.Supp. 809, 820 (D.Del.1990) (noting that § 213 exemption was "added to the FLSA 'to exclude from *any possible coverage* ... work performed by employees within a foreign country' " (quoting Senate report)), *aff'd*, 932 F.2d 218 (3d Cir.1991); *see also Nicholson v. World Business Network, Inc.*, 105 F.3d 1361, 1363 (11th Cir.1997); *DiGregorio v. Temple University*, No. 79-3221, 1983 WL 2147, at *12 (E.D.Pa.1983). *But cf. Wirtz v. Healy*, 227 F.Supp. 123, 129 (N.D.Ill. 1964) (construing § 213(f) exemption to apply only during workweeks in which an employee "performs *all* of his work *exclusively* in a foreign country" (emphasis added)). The ADA and Title VII, by contrast, apply to at least some actions of U.S. employers affecting employees outside the United States.

Congress enacted the 1991 amendments to Title VII and the ADA immediately on the heels of the Supreme Court's decision in *Aramco*, which held that Title VII's protections against employment discrimination did not extend extraterritorially to protect U.S. citizens employed abroad by U.S. employers. *Aramco*, 499 U.S. at 248-59, 111 S.Ct. 1227. In reaching that conclusion, the Supreme Court explicitly contrasted the language of Title VII with the language of the Age Discrimination in Employment Act of 1967 ("ADEA"), which had been amended in 1984 in a manner almost identical to the 1991 amendments to Title VII and the ADA.[3] *Aramco*, 499 U.S. at 256, 258-59, 111 S.Ct. 1227. The 1984 amendments to the ADEA expanded the definition of "employee" to include "any individual who is a citizen of the United States employed by an employer in a workplace in a foreign country" and simultaneously limited the ADEA's extraterritorial reach to exclude foreign operations of foreign corporations that are not "controlled" by a U.S. employer and discrimination by employers facing conflicts with the laws of the host countries. Older Americans Act Amendments of 1984, Pub.L. 98-459, 98 Stat. 1767, § 802(a)-(b) (1984) (codified at 29 U.S.C. §§ 623, 630). The Supreme Court observed in *Aramco* that "Congress, should it wish to do so,

---

3. While the Supreme Court had not yet determined the extraterritorial reach of the ADEA by the time the 1984 amendments to the ADEA were enacted, several courts had concluded that the statute did not apply extraterritorially. *See, e.g., Thomas v. Brown & Root, Inc.*, 745 F.2d 279, 281 (4th Cir.1984); *Cleary v. United States Lines, Inc.*, 728 F.2d 607, 609-10 (3d Cir.1984); *Pfeiffer v. William Wrigley Jr. Co.*, 573 F.Supp. 458 (N.D.Ill. 1983), *aff'd*, 755 F.2d 554 (7th Cir.1985); *Zahourek v. Arthur Young & Co.*, 567 F.Supp. 1453, 1454-56 (D.Colo.1983), *aff'd*, 750 F.2d 827 (10th Cir.1984); *see also Aramco*, 499 U.S. at 273 n. 7, 111 S.Ct. 1227 (Marshall, J., dissenting) (citing legislative history of 1984 amendments to ADEA).

may similarly amend Title VII and in doing so will be able to calibrate its provisions in a way that we cannot." *Aramco,* 499 U.S. at 259, 111 S.Ct. 1227.

With the 1991 amendments, Congress signaled its dissatisfaction with the Supreme Court's interpretation in *Aramco* and modified the ADA and Title VII in much the same way that it had amended the ADEA in 1984. While the limited legislative history of the 1991 amendments reveals nothing specific about congressional intent, the legislative history to the 1984 amendments to the ADEA indicates that Congress "carefully worded" those amendments "to apply only to citizens of the United States who are working for U.S. corporations or their subsidiaries." S.Rep. No. 98–467, at 27, 1984 U.S.C.C.A.N. 2974, 3000 (1984). The Senate committee report explicitly asserts that the 1984 amendments "do[ ] not apply to foreign nationals working for such corporations in a foreign workplace" or to "foreign companies which are not controlled by U.S. firms." *Id.* at 27–28, 1984 U.S.C.C.A.N. at 3000.01.

The language of the 1991 amendments to the ADA and Title VII, which apply those statutes extraterritorially to U.S. citizens "with respect to employment in a foreign country," 42 U.S.C. § 12111(4)(ADA); 42 U.S.C. §§ 2000e(f) (Title VII), is not exactly identical to the language of the 1984 amendments to the ADEA, which apply that statute extraterritorially to U.S. citizens "employed by an employer in a workplace in a foreign coun-try," 29 U.S.C. § 630(f). Nevertheless, it is clear that both sets of amendments distinguish between U.S. citizens working abroad for U.S. employers, who are protected from discrimination, and non-U.S. citizens working abroad for those same employers, who fall outside the statutory protections against discrimination. IBM maintains that this distinction is fatal for Torrico's ADA claim, arguing that since Torrico was not a U.S. citizen at any relevant point in time, the ADA does not apply extraterritorially to protect him from discrimination "with respect to employment in a foreign country." 42 U.S.C. § 12111(4).

Torrico, however, argues that application of the ADA in this case presents no extraterritoriality problem because (1) the alleged acts of discrimination took place in the United States, not in Chile, and (2) the Temporary Assignment did not constitute "employment in a foreign country" under 42 U.S.C. § 12111(4). Torrico characterizes IBM's argument to the contrary as a "specious attempt to redefine [his] employment relationship with IBM U.S. so as to trigger" the limitation on the statute's application "with respect to employment in foreign country" set forth in § 12111(4). (Pl. Br. at 12.) He argues that the facts alleged demonstrate that so far as both he and IBM were concerned at the time, Torrico remained a New York-based employee of IBM U.S. throughout the period of the Temporary Assignment.[4] Based on these factual allegations, Torrico

---

4. In its reply brief, IBM protests that a number of these allegations do not derive directly from Torrico's *pro se* complaint, but rather from documents and a declaration that accompany Torrico's opposition to IBM's motion to dismiss. (Def. Repl. Br. at 2–3.) While IBM suggests that the Court should not consider these factual allegations as a result, this argument is misplaced. When adjudicating a motion to dismiss, the Court may consider "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000). Moreover, "as long as they are consistent with the allegations of the complaint, a party may assert additional facts in his or her response to a motion to dismiss," especially where, as here, those factual allegations are directly responsive to a defense first raised in the motion itself. *Freeman v. Godinez,* 996 F.Supp. 822, 824–25 (N.D.Ill.1998). And as already noted, even though counsel now has appeared

maintains that the Temporary Assignment did not constitute "employment in a foreign country" and that his ADA claim therefore does not present any question of extraterritoriality at all. *Cf. Environmental Defense Fund*, 986 F.2d at 532 (since application of statute regulates conduct in the United States, not another sovereign country, and creates no "potential for clashes between our laws and those of other nations," no extraterritoriality problem is presented (internal quotation marks omitted)).

Torrico's first argument is misplaced, for it is clear under the language of the ADA that where the alleged acts of discrimination took place does not, by itself, control the question of whether a non-U.S. citizen employee falls within the scope of the statute's protection. Rather, the text of the statute is clear in providing that whether such an employee is protected by the ADA turns instead on whether the employee asserts a claim "with respect to employment in a foreign country." 42 U.S.C. § 12111(4). While the location of the alleged acts of discrimination might well be relevant to a factfinder attempting to answer the question of whether a claim concerns "employment in a foreign coun-

try," allegations of discriminatory conduct in the United States do not by themselves bring a non-U.S. citizen employee within the ambit of the statute's protections. Torrico's second argument, however, raises a legitimate question concerning the circumstances in which an employer's acts of discrimination on the basis of disability should be characterized as taking place "with respect to employment in a foreign country," rather than with respect to employment in the United States. Contrary to IBM's suggestion, the question cannot be answered simply by asserting that the ADA does not "apply extraterritorially" to discrimination against non-U.S. citizens.

IBM calls our attention to a number of cases in which courts have attempted to focus on the particular location where the employee worked, or was seeking to work, when determining the locus of a plaintiff's employment for purposes of the federal antidiscrimination laws. *See Mithani v. Lehman Bros. Inc.*, No. 01 Civ. 5927(JSM), 2002 WL 14359, at *1 (S.D.N.Y. Jan.4, 2002) (holding that Title VII does not apply to non-U.S. citizen who applied for position in London office of U.S. employer); *Hu v. Skadden, Arps, Slate, Meagher & Flom LLP*, 76 F.Supp.2d 476, 477–78

---

for Torrico, the Court also labors under an obligation to construe Torrico's *pro se* complaint liberally to raise the strongest arguments it suggests, especially since it asserts civil rights claims. *Lerman*, 232 F.3d at 139–40 & n. 3; *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir.2000). The Court therefore may consider factual "allegations contained in [the plaintiff's] other court filings." *Swofford v. Mandrell*, 969 F.2d 547, 549 (7th Cir.1992); *see Freeman*, 996 F.Supp. at 824 ("[B]ecause plaintiff is proceeding *pro se*, the court construes his pleadings more liberally than those submitted by an attorney, and the court should consider allegations contained in all of the plaintiff's filings.").

While the Court is therefore satisfied that these allegations properly may be considered when adjudicating IBM's motion, it would not be proper to grant IBM's motion, even if

those allegations could not properly be considered, without first giving the plaintiff an opportunity to amend his complaint to include them. *See Cruz*, 202 F.3d at 597–98 (holding that a *pro se* plaintiff "should be afforded the ... opportunity ... to amend his complaint prior to dismissal for failure to state a claim, unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim"); *cf. Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991) (the "usual practice" upon granting a defendant's motion to dismiss is to provide the plaintiff with an opportunity to amend the complaint). Accordingly, the Court grants Torrico leave to amend his complaint under Fed.R.Civ.P. 15(a) to incorporate the allegations and documents asserted in opposition to IBM's motion to dismiss.

(S.D.N.Y.1999) (holding that non-U.S. citizen plaintiff falls outside protection of ADEA, even though employment interviews and hiring decisions may have been made in New York, because "the job which plaintiff sought was to be performed in Beijing and Hong Kong"); *Iskandar v. American University of Beirut*, No. 98 Civ. 6616(WHP), 1999 WL 595651, at *2 (S.D.N.Y. Aug.9, 1999) (holding plaintiff is not covered by ADEA where he is a citizen of Lebanon, a resident of Beirut, and "was employed exclusively at the University's Beirut campus"); *Iwata v. Stryker Corp.*, 59 F.Supp.2d 600, 604–05 (N.D.Tex.1999) (concluding that plaintiff employed by Japanese subsidiary of U.S. employer is not an "employee" protected by ADEA or Title VII since he was not a U.S. citizen and he lived in Japan during the time of his employment); *Denty v. SmithKline Beecham Corp.*, 907 F.Supp. 879, 884 (E.D.Pa. 1995) (Pollak, J.) (concluding that "site of the workplace determines the applicability of the ADEA," but that "[t]he relevant work site is the location of the[ ] positions" for which the plaintiff was applying, "not the location of [the plaintiff's] employment at the time of the alleged discrimination"), *aff'd*, 109 F.3d 147, 150 n. 5 (3d Cir.1997); *Gantchar v. United Airlines, Inc.*, No. 93 C 1457, 1995 WL 137053, *6 (N.D.Ill. Mar.28, 1995) (in determining "whether plaintiffs' employment should be considered extraterritorial ... [t]he primary focus must be on the location of the plaintiffs' potential employment," meaning "the location of the work"); *Wolf v. J.I. Case Co.*, 617 F.Supp. 858, 863 (E.D.Wis.1985) ("It is the location of the 'work station,'" rather than place were plaintiff is hired or where termination decision is made, "that determines the applicability of the ADEA."). IBM argues that we should

follow the decisions in these cases to conclude that Torrico's allegations concern employment in Chile, rather than employment in the United States.

All of these cases, however, appear to present simpler factual scenarios distinguishable from the present case, and perhaps for that reason, oversimplify the analysis of what constitutes "employment in a foreign country." Most of these cases involve situations in which employment in the United States was never contemplated. Regardless of whether they were U.S. residents at the time that they sought employment or were hired, the non-U.S. citizen plaintiffs in those cases either sought employment or were hired to work exclusively (or almost exclusively) in foreign workplaces, without ever having first worked in the United States. *See Mithani*, 2002 WL 14359, at *1 (non-U.S. citizen sought position in London office of U.S. employer); *Hu*, 76 F.Supp.2d at 477–78 (non-U.S. citizen sought employment in U.S. employer's Beijing and Hong Kong offices); *Iskandar*, 1999 WL 595651, at *2 (non-U.S. citizen was employed exclusively in Lebanon); *Iwata*, 59 F.Supp.2d at 602, 604 (non-U.S. citizen was employed in Japan as chairman and president of U.S. employer's Japanese subsidiary). Moreover, in each of these cases the overseas employment was intended to be permanent. In *Denty v. SmithKline Beecham Corp.*, for example, the plaintiff lived and worked in the United States before seeking a more senior position in another country with the same employer, but the various overseas positions sought by the plaintiff all were permanent positions involving a new set of job responsibilities distinct from his existing responsibilities in the United States.[5] *Denty*, 907 F.Supp.

---

**5.** Denty also involved a *British* employer, rather than a U.S. employer, and a *U.S. citizen* plaintiff; the holding in that case therefore turned on the identity of the employer,

rather than the identity of the plaintiff, who would have been protected under 42 U.S.C.

at 881, 884–85. None of these cases involve temporary, fixed-term assignments from an existing, U.S.-based position like the Temporary Assignment at issue in this case.

Finally, at least one court determining the locus of a plaintiff's employment under the federal antidiscrimination laws has relied in part on interpretations of the foreign workplace exemption under the FLSA, 29 U.S.C. § 213(f), which provides that certain wage and hour requirements "shall not apply with respect to any employee whose services during the workweek are performed in a workplace within a foreign country." *See Gantchar*, 1995 WL 137053, at *4, *8–*9 (relying upon cases applying FLSA foreign workplace exemption in § 213(f) and affording "some weight" to EEOC policy statement interpreting ADEA and Title VII in light of case law under § 213(f)). However, whether an employer's discrimination takes place "with respect to employment in a foreign country," 42 U.S.C. § 12111(4)(ADA); 42 U.S.C. §§ 2000e(f) (Title VII), or even with respect to employment "in a workplace in a foreign country," 29 U.S.C. § 630(f) (ADEA), seems to present a different question from whether an employee's "services during the workweek are performed in a workplace within a foreign country," 29 U.S.C. § 213(f) (FLSA). *See Pfeiffer*, 755 F.2d at 556 (noting the "lack of 'fit'" between 29 U.S.C. § 213(f) and "the quite different sort of violation that consists of firing or otherwise discriminating against an employee on account of his age"). It might well be the case, for example, that an employee is not "employ[ed] in a foreign country" for purposes of the ADA while, at the same time, does perform "services during the workweek in a foreign country" within the meaning of the FLSA. The more specific language in the FLSA concerning wage and hour violations,

which "are unambiguously associated with a place in which the work is done," contrast with the somewhat different limitations on extraterritorial application of the federal laws against discrimination, since acts of discrimination are often "disconnected" from the "place in which [an employee's] work is done" in a manner that wage and hour violations are not. *Id.* at 556.

The difference between the two standards can be clarified by the simple and familiar concept of the business trip or temporary detail. Consider a non-U.S. citizen mechanic working for a U.S.-based airline. Hired for a position at John F. Kennedy International Airport, she has worked there for years. Due to an unforeseen emergency at an airport abroad, her employer asks her to go to the foreign airport for a special two-week assignment. Without question, while she is there, the employer could require her to work overtime without complying with the overtime pay provisions of the FLSA; that statute simply does not apply during weeks in which work is performed abroad. *See, e.g.,* *Cruz v. Chesapeake Shipping Inc.*, 738 F.Supp. 809, 820 (D.Del.1990) (foreign workplace exemption "exclude[s] from *any possible coverage* . . . work performed by employees within a foreign country'" (quoting Senate report)), *aff'd*, 932 F.2d 218 (3d Cir.1991). But the airline could not discriminate against the mechanic in work assignments on the basis of sex, let alone fire her for discriminatory reasons, and then defend the resulting Title VII claim on the ground that the discrimination was committed abroad. In this hypothetical, the worker was not "employ[ed] in foreign country," but in the United States. The federal antidiscrimination laws would protect the employee while on the temporary assignment abroad, and would do so whether she was a U.S. citizen or not.

§ 12111(4) had the defendant been a U.S. employer. *Denty*, 907 F.Supp. at 881.

Of course, what appears obvious in the case of a two-week business trip abroad—that the employee's place of employment is the United States, and that an employer cannot evade the application of the antidiscrimination laws to U.S.-based non-citizen employees by sending them to temporary duty outside the United States—is not so obvious when the temporary assignment lasts for a period of years. The principle, however, is the same; all that differs is how the principle applies to the particular situation. Whether Torrico was "employ[ed]" abroad or was employed in the United States and merely temporarily deployed to Chile is a question of fact which cannot be answered simply by noting that he spent the bulk of his time in Chile for the three years leading up to the alleged discriminatory termination.

In assessing this factual question, some guidance can be drawn from general employment law. Were Torrico to have asserted a common law claim for breach of an employment contract with IBM, application of New York's choice of law rules, *see Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), might well require this Court to apply New York law—not Chilean law—to adjudicate that claim, if it were found that the "center of gravity" of Torrico's employment relationship with IBM was in New York. *See, e.g., Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir.1997) (under New York's "center of gravity" approach to choice-of-law issues arising in contract cases, courts must "consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties") (citing *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 227, 597 N.Y.S.2d 904, 613 N.E.2d 936

(1993)); *Alonso v. Saudi Arabian Airlines Corp.*, No. 98 Civ. 7781(SAS), 1999 WL 244102, *6 (S.D.N.Y. Apr.23, 1999) (applying New York law to breach of implied employment contract claims where New York was the place of contracting and negotiation of employment terms, the location of defendant's U.S. headquarters, and the place where alleged wrongful termination decision was made, and where plaintiff worked for more than ten of his approximately sixteen years with the defendant in New York); *Zanfardino v. E–Systems, Inc.*, 652 F.Supp. 637, 639–40 (S.D.N.Y.1987) (Weinfeld, J.) (applying Texas law to determine statute of limitations for breach of employment contract claim where employee worked in Egypt but Texas was the place where the employment contract was negotiated, the defendant's main offices were located, and "the termination decision and all other executive decisions concerning [the plaintiff's] employment were made").

Similarly, it is the "center of gravity" of the entire employment *relationship* between the plaintiff and the defendant employer, rather than one or more particular locations where employment *duties* may have been performed, that answers the factual question of whether an individual is "employ[ed] in a foreign country" or in the United States within the meaning of the ADA. The center of gravity of an individual's relationship with an employer is determined by considering a variety of factors, including (but not limited to) whether any employment relationship had, in fact, been created at the time of the alleged discrimination, and if so, where that employment relationship was created and the terms of employment were negotiated; the intent of the parties concerning the place of employment; the actual or contemplated duties, benefits, and reporting relationships for the position at issue; the particular locations in which the plaintiff performed those employment duties

and received those benefits; the relative duration of the employee's assignments in various locations; the parties' domiciles; and the place where the allegedly discriminatory conduct took place. The list is not meant to be exhaustive; the center of gravity of the parties' relationship is to be determined based on the totality of circumstances.[6]

 Here, the facts alleged in the complaint and in Torrico's opposition to IBM's motion to dismiss might well support a conclusion that he was "employ[ed] in the United States." According to Torrico, he had already been employed by IBM in the United States for some period of time before being assigned to duty in Chile. He alleges that IBM temporarily assigned him to work in Chile not to take on a new set of responsibilities, but simply to facilitate the more effective performance of his existing, New York-based duties. The Temporary Assignment, Torrico maintains, involved substantial travel to IBM's New York headquarters and effected no substantive change in his employment relationship with IBM. Just as before the Temporary Assignment, Torrico's employment duties, obligations, and reporting responsibilities continued to run to IBM U.S. in New York; his activities and functions continued to be controlled and directed by executives of IBM U.S. in New York; and his compensation and benefits continued to be paid by IBM U.S. in New York, as part of the IBM U.S. compensation scheme. Moreover, Torrico alleges that IBM represented to U.S. tax and immigration officials that Torrico continued to be employed by IBM U.S. in New York, and that his assignment to IBM Chile was, in fact, temporary. He alleges as well that the agreement governing the assignment specifically anticipated that upon its conclusion, he would return to duties in the United States, and that responsibility for determining the nature of his next assignment would lie not with IBM Chile, but with the U.S.-based IBM LA.

Torrico therefore sufficiently has alleged sufficient facts from which a reasonable jury could find that the Temporary Assignment is properly characterized under the ADA as employment in the United States, rather than in Chile. While IBM contends that the facts alleged by Torrico demonstrate that he performed a significantly larger percentage of his employment duties in Latin America than in the United States, this exclusive focus on the percentage of employment duties performed abroad ignores the extensive array of contacts with the United States that Torrico also alleges. In the hypothetical example of the airline mechanic, for the duration of the two-week assignment, the employee spent 100 percent of her time, and performed 100 percent of her employment duties, in another country. But of course, looking only to that fact while entirely ignoring all other facts about her employment would mislead us about the essential nature of the employment relationship. According to Torrico, his longer stay abroad in this case was still a temporary interlude in a job that was centered in

---

**6.** For this reason, the standard applied here certainly will not, as suggested by IBM, expand the scope of the statute "to cover millions of foreign nationals who file an overseas application for U.S. employment" and thereby "exponentially increase the number of suits filed and result in substantial litigation costs." Def. Br. at 9 (quoting *Reyes–Gaona v. North Carolina Growers Ass'n, Inc.,* 250 F.3d 861, 866 (4th Cir.2001)). There is no reason to believe that most overseas applicants for employment with U.S. employers—whether the position sought is located in the United States or in another country—will have sufficient preexisting contacts with the employer or the United States to warrant the conclusion that the center of gravity of that applicant's relationship with the employer is in the United States.

New York, where he already had been working in essentially the same position and where both he and IBM expected him to return upon completion of his assignment. Even if Torrico performed the majority of his employment duties in one or more foreign countries during the term of the Temporary Assignment, he also alleges that the assignment did not alter his preexisting, New York-based employment relationship with IBM in any respect—and that neither he nor IBM regarded it as having done so.[7]

Unlike the majority of the cases cited by IBM, in which the overseas employment involved the creation of a new employment relationship, lacking any substantial preexisting contacts with the employer in the United States, see *Mithani*, 2002 WL 14359, at *1; *Hu*, 76 F.Supp.2d at 477–78; *Iskandar*, 1999 WL 595651, at *2; *Iwata*, 59 F.Supp.2d at 602, 604; *Wolf*, 617 F.Supp. at 860, Torrico here alleges that no new employment relationship was in fact created by the Temporary Assignment, which maintained most, if not all, of Torrico's preexisting U.S. contacts.[8] Torrico essentially alleges the existence of an "expatriate" position—though he resided abroad during the term of that assignment, he maintains that IBM continued to treat him as a U.S. employee in all respects and expected him to find a position in the United States upon the completion of that assignment; according to Torrico, the essential terms and conditions of his U.S.-based employment relationship did not change. *Cf.* Janice R. Bellace, *The International Dimension of Title VII*, 24 Cornell Int'l L.J. 1, 16 ("Because both the expatriate and the U.S. corporation view the expatriate as an employee of the U.S. corporation, and because the expatriate is expected to return to the U.S. while continuing in the employ of the U.S. corporation, the nexus between the employee and the corporation is close."). While the length of the assignment might cut against an ultimate factual conclusion that Torrico remained at all times employed in the United States, in light of all the facts pled the Court cannot conclude as a matter of law that Torrico's characterization of his employment is wrong.[9]

Of course, Torrico may not be able to support with evidence all of the facts al-

---

7. In this respect, IBM's alleged representations to U.S. immigration officials are particularly telling. Torrico maintains that on at least two occasions after the Temporary Assignment commenced, IBM informed the INS that Torrico (1) continued to be employed by IBM and (2) had only been *temporarily* assigned to IBM Chile. (Pl. Opp. to Mot. to Dismiss, Exs. 3, 5.) While these representations may not rise to the level of any sort of estoppel against IBM, a factfinder could well weigh them particularly heavily, coming as they do from IBM itself. Evidence that may later be adduced concerning these representations may shed light on the parties' understanding of the Temporary Assignment, especially if any evidence suggests that IBM stood to benefit from these representations to the INS (for example, by facilitating the ability of Torrico to enter the United States for business purposes).

8. Even if the Temporary Assignment *formally* created a new employment contract between Torrico and IBM, that would not necessarily change the result or analysis in any dramatic way. The strength of the substantive contacts between the parties' employment relationship and the United States might still overcome the formal creation of a new employment contract for Torrico to spend three years in Chile; indeed, on the facts alleged in this case, any such employment contract might well be considered yet another contact to the United States, since Torrico alleges that the Temporary Assignment was both "offered" and "accepted" in New York.

9. Having concluded that the facts alleged in the complaint can support the conclusion that the center of gravity of Torrico's employment remained in New York throughout the period of the Temporary Assignment, we need not consider the circumstances in which an employee might be characterized under the ADA

leged in his complaint and motion papers. Moreover, on a fuller record that includes additional facts adduced by IBM, the overall picture of Torrico's employment status might appear very different. But the Court need not speculate about what the facts might turn out to be on summary judgment or at trial. It is enough at this stage of the litigation to conclude that Torrico may be able to "prove ... facts in support of his claim which would entitle him to relief," *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), and accordingly IBM's motion to dismiss Torrico's ADA claim will be denied.

## II. New York Human Rights Law

Count Two of the complaint claims that IBM's termination of Torrico also violated Section 296 of the New York Human Rights Law ("NYHRL"), which makes it unlawful to discharge an individual from employment or to discriminate against an individual in compensation, terms, conditions, or privileges of employment on the basis of disability, or to refuse to provide reasonable accommodations to the known disabilities of an employee unless such accommodations would impose an undue hardship on the operation of the employer's business. N.Y. Exec. L. § 296(1)(a), (3). The Court may exercise supplemental

jurisdiction over this claim under 28 U.S.C. § 1367(a). As with his ADA claim, IBM argues that Torrico's state law claim should be dismissed because the NYHRL does not apply extraterritorially to reach discrimination against individuals employed outside of New York, let alone non-U.S. citizens employed outside the United States. Torrico again argues that since he continued to be employed by IBM in New York throughout the period of the Temporary Assignment and the alleged discrimination took place within the state of New York, his state law claim, like his ADA claim, does not implicate any extraterritoriality question.

Like the ADA, the NYHRL provides explicitly for its extraterritorial application but does so in limited fashion. Section 298–a(1) of the statute provides that the statute applies to acts of discrimination "committed outside this state against a resident of this state ... if such actions would constitute an unlawful discriminatory practice if committed within this state." N.Y. Exec. L. § 298–a(1). Legislative history indicates that this section was intended " 'to extend the [statute] extraterritorially so that it applies to acts committed outside the state by state residents and non-residents alike *against state residents.*' " [10] *Iwankow v. Mobil Corp.,* 150

as being employed in both the United States *and* another country. Most of the cases considering questions involving the extraterritorial application of the federal antidiscrimination laws, including most of those cited by IBM, seem to assume that an employee has *a* single place of employment—an assumption that cannot always be made in a global economy with a highly mobile workforce. *See* Stephen B. Moldof, *The Application of U.S. Labor Laws to Activities and Employees Outside the United States,* 17 Lab. Law. 417, 417 (Winter/Spring 2002) (noting that extraterritoriality jurisprudence in labor and employment context largely developed "at times when it was relatively easy to determine the location of a company's and its pertinent workforce," but that increasingly, "actions taken by a

business in one nation impact the conduct of businesses and work activities performed in other locations," and that "even job actions may no longer be confined to a single nation"). While some of the cases cited by IBM do appear to concern individuals working in positions that involve employment duties both within and outside the United States, *see, e.g., Gantchar,* 1995 WL 137053, at *6; *Wolf,* 617 F.Supp. at 861–63, none of them addresses the possibility that an individual's employment might have more than one locus for purposes of the antidiscrimination laws.

10. While only administrative remedies are available for discrimination against New York residents by *non-resident* defendants, *Sher-*

A.D.2d 272, 541 N.Y.S.2d 428, 429 (1st Dep't 1989) (quoting legislative history, and emphasis added in *Iwankow*); *see also Duffy v. Drake Beam Morin*, No. 96 Civ. 5605(MBM), 1998 WL 252063, at *12 (S.D.N.Y.1998) ("[T]he State Human Rights Law affords no remedy to a non-New York resident who suffers discrimination outside New York State."). In order to state a claim under the statute, therefore, it is necessary to allege either that "a discriminatory act was committed in New York or that a New York State resident was discriminated against." *Iwankow*, 541 N.Y.S.2d at 429.

■ Here, Torrico's allegations are sufficient to state a claim under the NYHRL on either basis. First, as already discussed above in connection with his ADA claim, Torrico alleges both that he was employed in New York and that IBM's discriminatory conduct took place in New York. These allegations are amply sufficient to state a claim under the NYHRL without creating any need to consider whether his claim falls within the scope of the extraterritorial provisions in § 298–a(1).[11] *Cf. Environmental Defense Fund*, 986 F.2d at 532 (since application of statute regulates conduct in the United States, not another sovereign country, no extraterritoriality problem is presented (internal quotation marks omitted)).

■ Second, even if IBM's allegedly discriminatory conduct did *not* take place in New York, Torrico has a plausible claim in the alternative that at the time of that alleged discrimination, he was a New York "resident" within the meaning of the NYHRL—*regardless* of where he was employed—and is therefore protected under the extraterritorial provision of § 298–a(1). Unlike other New York statutes, *see e.g.*, N.Y. Tax L. § 605(a), the NYHRL itself does not explicitly define the terms "resident" and "non-resident." Those terms "have not a uniform meaning" when used in statutes, but instead "are to be construed in light of the context with consideration of the purpose of the statutory enactment." *ITC Entertainment Ltd. v. Nelson Film Partners*, 714 F.2d 217, 221 (2d Cir.1983) (quoting *Morek v. Smolak*, 245 A.D. 355, 282 N.Y.S. 418, 419 (4th Dep't 1935)); *see also Perkins v. Guaranty Trust Co.*, 274 N.Y. 250, 259, 8 N.E.2d 849 (1937); *Rawstorne v. Maguire*, 265 N.Y. 204, 208, 192 N.E. 294 (1934); *State v. Collins*, 78 A.D.2d 295, 435 N.Y.S.2d 161, 162–63 (3d Dep't 1981).

■ While "residence" and "domicile" are not synonymous terms, New York courts have interpreted the statutory term "residence" to mean "domicile" in a variety of contexts—particularly where, as here, "a statute prescribes 'residence' as a quali-

---

*wood v. Olin Corp.*, 772 F.Supp. 1418, 1422–25 (S.D.N.Y.1991) (discussing and interpreting N.Y. Exec. L. § 298–a(1)–(3)), IBM is a New York corporation with its principal place of business in Armonk, N.Y. (Compl.¶ 6), and it is clear that a New York resident can maintain a civil action for out-of-state discrimination by a *resident* defendant. N.Y. Exec. L. § 298–a(2); *Sherwood*, 772 F.Supp. at 1422–23.

**11.** Indeed, Torrico's allegation that IBM's allegedly discriminatory conduct took place in New York—though insufficient, by itself, to support his ADA claim, as noted above—

would be sufficient to support his NYHRL claim regardless of his place of employment. Whether an employee who is not a New York resident falls within the scope of the NYHRL's protections depends not on the place of employment, as it would for the claim of a non-U.S. citizen under the ADA, but rather on where the alleged acts of discrimination took place. Of course, it might well be the case that where the locus of the allegedly discriminatory conduct is in dispute, the place of employment remains a relevant factor that a reasonable factfinder would consider in determining the place where the alleged discrimination took place.

fication for a privilege or the enjoyment of a benefit." *Collins*, 435 N.Y.S.2d at 162 (citing cases interpreting term "residence" in Domestic Relations Law, Social Services Law, and Election Law, and construing "residence" in Education Law to refer to "domicile"). The term "domicile" refers to "one's principal and permanent place of residence where one always intends to return to from wherever one may be temporarily located, and from which one has no present intention of moving." 49 N.Y. Jur.2d Domicil & Residence § 2 (citations omitted); *Nat'l Artists Mgmt. Co. Inc. v. Weaving*, 769 F.Supp. 1224, 1227 (S.D.N.Y. 1991) ("domicile" refers to "the place where [an individual] has his true, fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning."); *Hamilton v. Accu–Tek*, 13 F.Supp.2d 366, 369 (E.D.N.Y.1998) ("Domicile is established by residence in fact, coupled with the intent to make the place of residence one's home." (internal quotation marks and citation omitted)). An individual may have more than one residence, but only may have one domicile at any given point in time. For an individual to establish domicile in New York, the individual must be physically present in the state and must have the intent to remain in the state indefinitely. *Nat'l Artists Mgmt. Co.*, 769 F.Supp. at 1227; *see Linardos v. Fortuna*, 157 F.3d 945, 948 (2d Cir.1998) ("It is well established that in order 'to effect a change of one's legal domicil, two things are indispensable: First, residence in a new domicil; and, second, the intention to remain there. The change cannot be made, except *facto et animo*. Both are alike necessary. Either without the other is insufficient.'") (quoting *Sun Printing & Publishing Ass'n v. Edwards*, 194 U.S. 377, 383, 24 S.Ct. 696, 48 L.Ed. 1027 (1904)). That second element, the intent to remain, "does not require that the person have an affirmative intent to remain permanently in the state, [but] merely that she has no present intent to move" somewhere else. *Nat'l Artists Mgmt. Co.*, 769 F.Supp. at 1227.

■ Here, Torrico maintains that prior to the Temporary Assignment, he was a resident of New York employed by IBM at its offices in Armonk. While the complaint is silent as to Torrico's immigration and domiciliary status prior to the Temporary Assignment, the Court assumes for the purposes of deciding this motion that Torrico also was domiciled in New York during that period of residence in New York. While it is undisputed that Torrico was not a U.S. citizen at the time of his prior employment in New York, and the complaint does not reveal his immigration status at that time, it is clear that non-U.S. citizens are by no means precluded from becoming New York domiciliaries simply by virtue of either their foreign citizenship or their immigration status. *See Jacoubovitch v. Jacoubovitch*, 279 A.D. 1027, 112 N.Y.S.2d 1, 1 (2d Dep't 1952) (holding that non-U.S. citizens who entered United States on non-immigrant visas in connection with employment within the state were not precluded on that basis from establishing domicile in New York); *Taubenfeld v. Taubenfeld*, 276 A.D. 873, 93 N.Y.S.2d 757, 759 (2d Dep't 1949) (holding that "the mere fact that plaintiff entered the United States on a transit visa does not establish as a matter of law that she may not acquire a domicile [in New York]"); *Cocron v. Cocron*, 84 Misc.2d 335, 375 N.Y.S.2d 797, 809 (N.Y.Sup.Ct.1975) ("It is clear that an alien can retain her foreign nationality and citizenship and still establish a domicile in New York."); *see also Elkins v. Moreno*, 435 U.S. 647, 666–67, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978) (holding that certain non-immigrant aliens may "develop a subjective intent to stay in the United States ... without violating"

federal immigration law, and therefore may establish domicile in a particular state if state law otherwise permits them to do so); cf. *Williams v. Williams,* 328 F.Supp. 1380, 1384 (D.Vi.1971) (concluding that non-immigrant's entry into with United States "with the dual intent to return to their residence in a foreign country, if compelled, but to remain the United States if permitted to do so .. is consistent with the intent necessary to acquire domicile").

In view of the foregoing principles, if Torrico was in fact domiciled in New York prior to the Temporary Assignment, then it seems unlikely that his agreement to undertake that assignment would have been sufficient to effect a change in his New York domicile. As already noted, an individual "changes domicile when taking up residence in a new place with the intention of remaining there." *Hamilton,* 13 F.Supp.2d at 369. Accordingly, "[a] sojourn or visit in a foreign country, no matter how long continued, without any intention of remaining there permanently," does not result in a change of domicile. 49 N.Y. Jur.2d Domicil & Residence § 30; *see In re Newcomb's Estate,* 192 N.Y. 238, 250, 84 N.E. 950 (1908) ("Mere change of residence, although continued for a long time, does not effect a change of domicile, while a change of residence even for a short time, with the intention in good faith to change the domicile, has that effect."); cf. *Universal Reinsurance Co., Ltd. v. St. Paul Fire & Marine Ins. Co.,* 224 F.3d 139, 141 (2d Cir.2000) ("Of course, a person may still be domiciled in a state even if a non-resident, so long as he or she has his home there and intends to return."). Since Torrico claims that the Temporary Assignment was, in fact, intended to be temporary—and that at the end of that assignment, both he and IBM intended for him to return to another position at IBM based in the United States—the Court cannot conclude that he intended to change his domicile from New York to

Chile upon accepting the Temporary Assignment. Whether Torrico ever was domiciled in New York, and if so, whether he subsequently changed that domicile to Chile, are mixed questions of law and fact not properly resolved at this stage of the litigation. *Nat'l Artists Mgmt. Co.,* 769 F.Supp. at 1228.

■ In passing, IBM suggests that federalism limits the authority of New York to regulate conduct outside the territorial jurisdiction of the United States. (Def. Br. at 5) (citing *New York Times Co. v. N.Y.C. Comm'n on Human Rights,* 41 N.Y.2d 345, 352–53, 393 N.Y.S.2d 312, 361 N.E.2d 963 (1977)). However, no such per se limitation exists concerning the application of state laws to conduct taking place outside the United States. *See, e.g., Skiriotes v. Florida,* 313 U.S. 69, 77, 61 S.Ct. 924, 85 L.Ed. 1193 (1941) (holding that state law may permissibly regulate conduct outside the United States "with respect to matters in which the State has a legitimate interest and where there is no conflict with acts of Congress"); *Barclays Bank PLC v. Franchise Tax Board of California,* 512 U.S. 298, 311, 320–31, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994) (upholding state taxation scheme affecting foreign commerce against constitutional challenge, since it does not threaten the federal government's "capacity to speak with one voice when regulating commercial relations with foreign governments" (internal quotation marks and citation omitted)); cf. *Babcock v. Jackson,* 12 N.Y.2d 473, 481–85, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963) (holding that under New York conflict of law rules, New York law governs case involving automobile accident taking place in Ontario). IBM makes no argument that extraterritorial application of the NYHRL in this case runs afoul of any federal statutory or constitutional provision, or even that such application of the NYHRL re-

sults in any conflict with international law or the laws of another country.[12] And § 298-a of the NYHRL comes nowhere close to interfering with the federal government's conduct of foreign relations, certainly not as applied in this case to the allegedly discriminatory conduct of IBM, a New York corporation. The provision is of general application and does not attempt to structure a relationship between New York, its residents, and any particular country. Nor does application of the NYHRL in this case require any inquiry into the actual administration of foreign law.

The only case that IBM cites in support of its argument stands for a much narrower proposition than IBM contends. In that case, the New York City Commission on Human Rights sought to apply the City's antidiscrimination laws so as to "impose an economic boycott," in effect, against the Republic of South Africa. *New York Times Co.*, 41 N.Y.2d at 351, 393 N.Y.S.2d 312, 361 N.E.2d 963. The New York Court of Appeals concluded that application of those laws threatened to "impair the effective exercise of the Nation's foreign policy," noting that "[e]ach locality in each State may not adopt its own foreign policy." *Id.* at 352–53, 393 N.Y.S.2d 312, 361 N.E.2d 963. However, the Court also explicitly noted that the *absence* of any contention in that case that "application of [the New York City antidiscrimination] laws to international transactions would be an unconstitutional municipal regulation of foreign commerce." *New York Times Co.*, 41 N.Y.2d at 349, 393 N.Y.S.2d 312, 361 N.E.2d 963. Plainly, the situation addressed in *New York Times Co.*—which involved the antidiscrimination laws of the City of New York, not the NYHRL—is distinguishable from the circumstances presented in this case, in which application of the NYHRL neither targets a particular country, nor involves any apparent conflict with the laws of another country, nor raises any issue of "foreign policy."

We need not concern ourselves in this case with the question of whether some other, hypothetical circumstance might exist in which extraterritorial application of the NYHRL presents an unavoidable conflict with federal law, international law, or the laws of another country. At least as applied to Torrico's allegations of discrimination by IBM—a New York corporation subject to the prescriptive jurisdiction of the state of New York under the nationality principle, *see Restatement (Third) of Foreign Relations Law of the United States* § 402(2) (a state has jurisdiction to legislate with respect to "the activities, interests, status, or relations of its nationals outside as well as within its territory")—the extraterritorial provisions of the NYHRL constitute a permissible exercise of the state's legislative authority.

Since Torrico sufficiently has alleged that IBM's alleged acts of discrimination took place in New York, and while he was employed in New York, the complaint properly states a claim for relief under the NYHRL; in the alternative, even if those alleged acts of discrimination took place outside of New York, Torrico sufficiently has alleged that at the time of the alleged discrimination, he was a New York "resident" within the meaning of the NYHRL and is therefore protected under the extraterritorial provision of § 298-a(1). IBM

---

**12.** Unlike the ADA, the extraterritorial provisions of the NYHRL do not contain any *explicit* provision for situations in which employers face conflicting obligations under the laws of the host jurisdiction. However, where extraterritorial application of such a statute might result in a potential conflict with foreign law, courts may resort to general conflicts principles or, if appropriate, abstention on the basis of international comity.

therefore has failed to establish that Torrico cannot "prove ... facts in support of his claim which would entitle him to relief," *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99, and accordingly its motion to dismiss Torrico's NYHRL claim will be denied.

## CONCLUSION

For the foregoing reasons, IBM's motion to dismiss is denied. Counts Three and Four of the complaint, which respectively raise claims under 42 U.S.C. § 1981 and ERISA, are dismissed pursuant to Fed.R.Civ.P. 41(a)(2).

SO ORDERED.