**John W. PFEIFFER,**
**Plaintiff-Appellant,**

v.

**WM. WRIGLEY JR. COMPANY,**
**Defendant-Appellee.**

No. 83–2935.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 28, 1984.
Decided Feb. 14, 1985.

---

Steven J. Rosenberg, Chicago, Ill., for plaintiff-appellant.

Carol B. Manzoni, Pope, Ballard, Shepard & Fowle, Ltd., Chicago, Ill., for defendant-appellee.

Before CUDAHY and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

The question for decision is whether the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.*, before it was amended in 1984, had any extraterritorial reach.

The plaintiff, John Pfeiffer, was hired in 1974 in Chicago by Wm. Wrigley Co. to be the company's Director for the Soviet Union and Eastern Europe. In 1978 he was put on the rolls of Wrigley's wholly owned German subsidiary, Deutsche Wrigley GmbH, where he continued to do the same type of work as before out of his office and home, both of which were in Munich. He was let go in 1983 when he turned 65, and brought this suit against Wm. Wrigley Co. The district court dismissed the suit on the company's motion for summary judgment. 573 F.Supp. 458 (N.D.Ill.1983). For purposes of this appeal we must assume (though the facts are controverted) both that Wrigley directed its German subsidiary to drop Pfeiffer and that it did so on account of his age.

The Act provides, in 29 U.S.C. § 626(b), that its provisions "shall be enforced in accordance with the powers, remedies, and procedures provided in section ... 216 (except for subsection (a) thereof) ... of this title." When we go to 29 U.S.C. § 216, which is part of the Fair Labor Standards Act, we find in subsection (d) that "no employer shall be subject to any liability or punishment under this chapter ... with respect to work heretofore or hereafter performed in a workplace to which the exemption in section 213(f) ... is applicable." Section 213(f) provides that the Fair Labor Standards Act "shall not apply with respect to any employee whose services during the work-week are performed in a workplace within a foreign country." The Third Circuit held in *Cleary v. United States Lines, Inc.,* 728 F.2d 607 (3d Cir. 1984), that the unequivocal meaning of this chain of incorporations is that an employee who works outside of the United States has no rights under the Age Discrimination in Employment Act, and its holding has been adopted by the Fourth and Tenth Circuits. See *Thomas v. Brown & Root, Inc.,* 745 F.2d 279, 281 (4th Cir.1984) (per curiam); *Zahourek v. Arthur Young & Co.,* 750 F.2d 827 (10th Cir.1984).

Against the approach taken in these decisions it can be noted that section 626(b) does not say that the provisions of the Age Discrimination in Employment Act shall be enforced in accordance with section 216 (minus subsection (a) thereof) and hence in accordance with section 213(f); it says it "shall be enforced in accordance with the

powers, remedies, and procedures" in section 216. Both sections are, as we said earlier, part of the Fair Labor Standards Act, which fixes maximum hours and minimum wages. Section 216(a) creates criminal remedies for violation of that Act, and it seems apparent that one purpose of the reference in section 626(b) to section 216 was to exclude criminal remedies for violations of the Age Discrimination in Employment Act. Cf. 113 Cong.Rec. 31254 (1967) (remarks of Senator Javits). Sections 216(b) and (c) of the Fair Labor Standards Act create private damage remedies, and a public remedy enforced by the Secretary of Labor, respectively, and the evident purpose of section 626(b) was to make these civil remedies available to people complaining of violations of the Age Discrimination in Employment Act. The part of section 216(d), quoted earlier, that incorporates section 213(f) by reference creates an exemption rather than a power, remedy, or procedure; and maybe therefore section 626(b), even when read literally, does not incorporate this part of section 216(d) and therefore does not read on the issue of extraterritoriality. This distinguishes *Lorillard v. Pons*, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), which held that there is a right to a jury trial in age-discrimination cases, and which the Third Circuit in *Cleary* relied on heavily for the view that Congress meant eactly what it said when in the age-discrimination law it incorporated by reference most of the procedures and remedies of the Fair Labor Standards Act. See 728 F.2d at 608–10; 434 U.S. at 582, 98 S.Ct. at 871.

There is also a lack of "fit" between section 213(f), obviously drafted with reference to wage and hour violations only, and the quite different sort of violation that consists of firing or otherwise discriminating against an employee on account of his age. With the exception of such ambulatory jobs as airline pilot, or a bus driver or tour director whose duties take him across our boundaries with Mexico or Canada, see *Hodgson v. Union de Permisionarios Circulo Rojo, S. de R.L.*, 331 F.Supp. 1119, 1121–22 (S.D.Tex.1971); *Wirtz v. Healy*,

227 F.Supp. 123, 129 (N.D.Ill.1964), the wages a worker is paid and the hours he works are unambiguously associated with a place in which the work is done, and therefore the only question in applying section 213(f) to a wage or hour violation is, where was the worker working when the violation occurred? But in the case of age discrimination the unlawful act is disconnected from the employee's work. He might have done all his work in the United States and been transferred abroad for one day so that he could be fired without violating the Age Discrimination in Employment Act. This ploy would not succeed in a wages or hours case; a transfer abroad would not wipe out previous violations of the worker's rights under the Fair Labor Standards Act. It would be pretty surprising if the ploy worked in an age-discrimination case, and Wrigley does not argue it would— which may indicate some sense of unease about the literal approach to the incorporation of section 213(f) into section 626(b).

But even if the approach taken by the other circuits is not completely compelling on its own terms, we can find nothing in the Age Discrimination in Employment Act or its background that suggests the Act was intended to have an extraterritorial reach beyond what might be necessary to prevent transparent evasions of the sort suggested in our last paragraph. The federal agencies responsible for enforcing the Act have assumed, apparently from the beginning, that it was intended to be limited to domestic employment. See, e.g., 29 C.F.R. § 860.20 (1970). And to apply the Act extraterritorially could be more than a little awkward. The normal basis of national sovereignty is territorial. So if Germany has a law requiring employees to retire at the age of 65 (presumably to spread work in order to reduce unemployment), no one can doubt the authority of Germany to apply the law to Pfeiffer; and if it did so, and if the Age Discrimination in Employment Act were also applicable, Wrigley would find itself having to comply with inconsistent laws, which it could do only by moving Pfeiffer to another coun-

try. Incidentally, this particular problem would not arise under the Fair Labor Standards Act itself if that Act were applied abroad. There can be few if any nations that fix a maximum wage, or minimum hours of work, so there would be no conflict between the Act and local law—although having to pay American wages to foreign workers might of course impose a crushing competitive disadvantage on American firms abroad.

Pfeiffer's lawyer stated at oral argument that Germany does have a law, applicable to Pfeiffer, requiring retirement at age 65. Our own perhaps halting efforts to research the German law of retirement leave us unclear whether this is so, see Schaub, Arbeitsrechts Handbuch 280, no. 7; 505, no. 13; 1013, § 8.I (1972); and although we could treat counsel's statement as an admission (and a very damaging one to his cause), we hesitate to place heavy weight on an unguarded and possibly inaccurate statement made in the heat of oral argument. We shall therefore treat the hypothetical German law merely as an illustration of the problems that could arise in applying the Age Discrimination in Employment Act abroad.

The fear of outright collisions between domestic and foreign law—collisions both hard on the people caught in the cross-fire and a potential source of friction between the United States and foreign countries—lies behind the presumption against the extraterritorial application of federal statutes, on which see, e.g., *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949); *Commodity Futures Trading Comm'n v. Nahas*, 738 F.2d 487, 493 (D.C.Cir.1984). Although the presumption is not absolute, see, e.g., *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 730 F.2d 1103, 1107–08 and n. 11 (7th Cir.1984), we can think of no good reason for departing from it here. Indeed, its wisdom is confirmed by imagining the complications that could result from applying the Age Discrimination in Employment Act in a case where the employer was foreign and the employee American, or the employer American and the employee foreign, or both foreign. Pfeiffer would like us to limit our consideration to a case—his case—where both employer and employee are American (since for purposes of this appeal we must assume, as Pfeiffer alleges, that Deutsche Wrigley is just the alter ego of its American parent). But we cannot do that unless there is some principled basis for confining the extraterritorial reach of the statute (if it has any such reach) to his case. Nothing in the language of the statute suggests a basis for doing this but it can be argued that conflict of laws principles would automatically confine the Act's extraterritorial reach. This would certainly have been true in the old days, when the substantive law applicable to a tort suit was the law of the jurisdiction where the last act necessary to make the defendant's conduct tortious had occurred, which here was the discharge of Pfeiffer from his place of work in Germany. There is no tort without an injury, see, e.g., *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 453 (7th Cir.1982), and there was no injury to Pfeiffer until he was actually let go, which happened in Germany. But modern conflicts principles are altogether more complex than this. Without having to go deeply into the question (which would require us first to decide where a court should look to find the conflict of laws principles applicable to a federal-question case, a question on which, as noted in Currie, Federal Courts 447 (3d ed. 1982), there is surprisingly little authority), we note that if either the plaintiff or the defendant were American and the contract of employment had been signed in America, an American court might well decide to apply American rather than foreign substantive law to decide the parties' tort rights and duties arising from the employment relationship—and maybe would do so wherever the contract had been signed. See, e.g., *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 13–25, 203 A.2d 796, 802–07 (1964); *Belanger v. Keydril Co.*, 596 F.Supp. 823, 826–27 (E.D.La.1984); Restatement, Second, Conflict of Laws § 145, comment f, at p. 424 (1971); Sedler, *Rules of Choice of*

*Law Versus Choice-of-Law Rules: Judicial Method in Conflicts Tort Cases*, 44 Tenn.L.Rev. 975, 1036–37 (1977). Thus, conflict of law principles cannot be assumed to confine the operation of the Act to the situation presented in this case, where both parties are American although the employee did all his work abroad—unless Germany really does require retirement at age 65; for then it would be quite clear that the Age Discrimination in Employment Act must yield. See Restatement, Foreign Relations Law of the United States (Revised), tent. draft no. 3, § 419(1)(a) (1982).

So conflict of law principles cannot be counted on to avoid entangling the Age Discrimination in Employment Act in disputes having less of a domestic focus than this case, if the Act is given extraterritorial effect; and this gives point to the observation that "federal statutes designed to be applied to conduct taking place outside the United States usually so provide," Restatement, Second, Foreign Relations Law of the United States, § 38, note 1, at p. 108 (1965) (giving examples). Although a comparison of the Second Restatement with the tentative drafts for what may soon be the Third Restatement suggests a slight movement away from reliance on territoriality as the touchstone of jurisdiction, see Restatement, Foreign Relations Law of the United States (Revised), tent. draft no. 2, §§ 402–403 (1981), a potential for conflict between legal duties imposed by two countries continues to be an argument (though not conclusive) against extraterritorial application, see *id.*, § 403, comment d. Moreover, "it is more plausible to interpret a statute of the United States as having reach beyond the territory when it is international in focus, for example the Trading with the Enemy Act, 50 U.S.C.App. § 1 et seq., than when it has a primarily domestic focus, such as the National Labor Relations Act, 29 U.S.C. § 151 et seq. Legislation dating from an earlier day, when economic regulation was less ambitious, is less likely than more recent legislation to reflect the intention of the legislators to reach out beyond the nation's frontier." *Id.*, § 403,

comment f, at p. 109. Although the Age Discrimination in Employment Act is more recent than the National Labor Relations Act, the relevant provisions date from 1968, when the extraterritorial application of domestic regulatory statutes was still a rarity, other than in areas such as antitrust where conduct abroad can have substantial consequences in the United States.

One of the new sections proposed for the revised Restatement of Foreign Relations Law provides that the United States has jurisdiction to apply its laws to foreign subsidiaries of U.S. corporations, and an accompanying comment states that "suggestions that United States laws against employment discrimination be made applicable to foreign branches or subsidiaries of United States corporations would be consistent with the provisions of this section when applied to employees who are U.S. nationals." Restatement, Foreign Relations Law of the United States (Revised), tent. draft no. 2, § 418, comment f (1981). However, the next comment is that such extraterritorial application "is not to be presumed in the absence of clear intent by Congress expressed or fairly implied," *id.*, comment g, which is absent here.

But the Fair Labor Standards Act *explicitly* does not apply abroad (see section 213(f)); and it can be argued that if there really were a strong presumption against extraterritorial application of laws regulating employment, Congress would not have bothered to negative such application explicitly. Whatever force this argument might have in other contexts (perhaps little, because it may impute too much knowledge of background law to Congress and because it ignores a draftsman's prudent as well as natural inclination to make explicit even what may fairly be assumed to be implicit) is blunted here by the history of section 213(f). That section was added to the Fair Labor Standards Act by the Overseas Labor Standards Amendments of 1957 in order to overrule a Supreme Court decision that had given the Act a very modest extraterritorial reach by applying it to workers at an American military base over-

seas. *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 69 S.Ct. 140, 93 L.Ed. 76 (1948); see S.Rep. No. 987, 85th Cong., 1st Sess. (1957). The hostility that Congress displayed to the courts' giving the Fair Labor Standards Act any extraterritorial application at all cannot be used to argue that Congress would have wanted the courts to give the Age Discrimination in Employment Act a general extraterritorial application.

■ Although there have been some attempts in recent years to give extraterritorial application to Title VII of the Civil Rights Act of 1964, which forbids racial, sexual, and related discrimination in employment, see *Bryant v. International Schools Services, Inc.*, 502 F.Supp. 472, 481–83 (D.N.J.1980), rev'd on other grounds, 675 F.2d 562, 565 (3d Cir.1982); 1 Larson, Employment Discrimination § 5.60 (1984 and Supp.1984); cf. Note, *Civil Rights in Employment and the Multinational Corporations*, 10 Cornell Int'l L.J. 87 (1976), these attempts are based on statutory language that has no counterpart in the Age Discrimination in Employment Act, and also long postdate the enactment of that Act in 1968. A lively debate would probably have ensued in Congress if anyone had thought the new law might be applied to employees living and working in foreign countries. There was no such debate, and while we do not read into silence a deliberate rejection of extraterritorial effect—it is not like Congress to negate every conjectural possibility; it has limited capacity for surveying the future, and encounters difficulty enough in resolving points actually in dispute—we are left with no basis for thinking that Congress in 1968 would have wanted us to apply the Act to workers living and working abroad.

All this is not to say, however, that if Pfeiffer had worked for Wrigley in the United States, and Wrigley to get around the Age Discrimination in Employment Act had moved him abroad in his last day (or week, or month—we need not explore the outer bounds of the limiting principle sketched here) and then fired him, it would

be immune from liability under the Act. In that hypothetical case Pfeiffer's relevant work station would be (we may assume, without having to decide) the United States. This much flexibility the Act may have. But we do not think it has a general extraterritorial effect even in a case such as this where both the employer and the employee are American. Pfeiffer was employed overseas—lived and worked there—continuously throughout his entire period of employment by Wrigley, and this made his work station foreign and deprived him of the protections of the Act. The complaint was therefore properly dismissed.

After argument in this case Congress passed the Older Americans Act Amendments of 1984, Pub.L. 98–459, 98 Stat. 1767, which in section 802, 98 Stat. 1792, extends the protection of the Age Discrimination in Employment Act to United States citizens employed abroad by American corporations or their subsidiaries, though with an exception (an exception that might in any event put Pfeiffer out of court) for cases where applying the Act would violate the law of the country where the citizen is employed. The amendment has no direct application to this case because it does not apply retroactively, but Pfeiffer invites us to treat the amendment as clarifying rather than changing the meaning of the original act. The weight to be given an amendment in interpreting the original statute is a vexing question on which we wrote recently in *In re Tarnow*, 749 F.2d 464, 467 (7th Cir. 1984). Here it is enough to note that since the legislative history of the 1984 amendment leaves totally obscure whether the amendment was meant to change the law, to state more clearly the original meaning of the law, or perhaps just to limit the extraterritorial application of the Act (to American citizens employed by American corporations or their subsidiaries in countries that do not have inconsistent laws), see H.R.Rep. No. 1037, 98th Cong., 2d Sess. 49 (1984), U.S.Code Cong. & Admin. News 1984, pp. 2974, 3018, 3037 (describing the 1984 amendments to the age-discrimination laws as "minor"); 130 Cong.Rec. S11862, S11864 (daily ed. Sept. 26, 1984), it

does not alter our conclusion that the judgment in favor of Wrigley should be, and it is,

AFFIRMED.