460 F.3d 296
 John OFORI-TENKORANG, Plaintiff-Appellant,
v.
AMERICAN INTERNATIONAL GROUP, INC., AIG Financial Products Corp., AIG International, Inc. and AIG Trading Corp., Defendants-Appellees.
Docket No. 05-5272-cv.
 United States Court of Appeals, Second Circuit.
 Argued: May 9, 2006.
 Decided: August 15, 2006.
 
 Anne C. Vladeck (Rebecca J. Osborne, on the brief), Vladeck, Waldman, Elias & Engelhard, P.C., New York, NY, for Plaintif-Appellant.
 P. Kevin Connelly, Connelly Sheehan Harris, Chicago, IL (Kristine Aubin, Connelly Sheehan Harris, Chicago, IL and Marc E. Bernstein, New York, NY, on the brief), for Defendants-Appellees.
 Before WINTER, CABRANES and RAGGI, Circuit Judges.
 JOSÉ A. CABRANES, Circuit Judge.
 
 
 1
 The issue presented is whether the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1981 ("Section 1981"),[1] may be applied to prohibit an employer's allegedly discriminatory conduct arising from the overseas assignment of plaintiff, a non-citizen. We review here the dismissal by the United States District Court for the Southern District of New York (Denise Cote, Judge) of claims against American International Group, Inc., AIG International, Inc., AIG Financial Products Corp., and AIG Trading Group, Inc. (collectively "AIG" or "defendants") of unlawful discrimination on the basis of race brought under Section 1981. Presumably because other discrimination statutes reaching the employment relationship, such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), limit pertinent aspects of their coverage to U.S. citizens,[2] plaintiff's federal law claims rest entirely on Section 1981, which protects "persons." But unlike those other civil rights statutes, which have been amended deliberately to reach conduct occurring outside the United States,[3] Section 1981 protects only "persons within the jurisdiction of the United States," 42 U.S.C. § 1981(a).
 
 
 2
 Based on the text and legislative history of Section 1981, we conclude, as a matter of first impression in this Circuit, that Congress has not extended the coverage of Section 1981 beyond the territorial jurisdiction of the United States. Accordingly, we affirm the holding of the District Court dismissing plaintiff's Section 1981 claims to the extent that those claims arise from alleged discriminatory conduct that occurred while plaintiff was living and working in South Africa. We conclude, however, that the District Court erred in dismissing plaintiff's claims insofar as he alleges discriminatory conduct that occurred while he was in the United States. We therefore vacate the judgment of the District Court insofar as it dismissed those claims, and we remand the cause for further proceedings consistent with this opinion.
 
 I. BACKGROUND
 
 3
 We set forth the facts as alleged by plaintiff, mindful that on a motion to dismiss we accept all factual allegations as true and draw all reasonable inferences in plaintiff's favor. See Twombly v. Bell Atl. Corp., 425 F.3d 99, 106 (2d Cir.2005).
 
 
 4
 Plaintiff-appellant John Ofori-Tenkorang ("Ofori") is a black man who has been employed by AIG and who maintains his permanent residence in Connecticut. Ofori, a non-citizen, began working in AIG's Connecticut offices in September 1996 as a Research Analyst. "By September 2003, Ofori held the position of Structurer and Marketer in AIG's Financial Services Division." Compl. ¶ 8. At that time, senior AIG executives based in Connecticut and London decided to reassign Ofori to work on a temporary basis in one of the company's offices in South Africa. According to a "Confirmation of Assignment Letter" signed by Ofori on September, 2, 2003, South Africa was designated as Ofori's "host country," while the United States remained his "home country." AIG promised, among other things, to (a) pay Ofori's salary in U.S. dollars, which were to be directly deposited into Ofori's bank account in Connecticut, (b) cover his housing and transportation costs in South Africa, (c) prepare all necessary paperwork pertaining to his South African employment, and (d) reimburse him for certain travel expenses to and from the United States. Id. ¶¶ 10-12.
 
 
 5
 Ofori alleges that before and after his arrival in South Africa he was singled out for discriminatory treatment on account of his race. Specifically, Ofori asserts that before he left the United States, AIG personnel decided to send him to South Africa and made arrangements with respect to his work environment in South Africa. Ofori's workplace in South Africa was allegedly situated in an office with a white colleague of questionable ethics, apart from the office where a majority of his white, soon-to-be colleagues worked. See id. ¶¶ 16-17. Upon his arrival, Ofori allegedly was subjected to greater scrutiny than his white colleagues when attempting to obtain reimbursement for business-related expenses, see id. ¶ 18, blamed for poor business performance that was unrelated to his work, see id. ¶ 20, threatened with termination after only a single poor performance review, see id. ¶ 23, given a smaller bonus than similarly-situated colleagues, see id. ¶ 24, wrongfully accused of stealing funds from the South African businessman with whom he shared an office, see id. ¶¶ 25-26, improperly suspended from work, see id. ¶¶ 27-31, and required to provide more documentation than his white colleagues to justify his request for medical leave, see id. ¶¶ 36, 39.
 
 
 6
 In March 2005, Ofori brought an action in the United States District Court for the Southern District of New York against AIG and its subsidiaries, alleging that he was (1) subjected to discrimination and retaliated against on the basis of his race, in violation of 42 U.S.C. § 1981 and New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYHRL"), and (2) subsequently defamed by AIG. Defendants-appellees moved to dismiss Ofori's claims under Federal Rule of Civil Procedure 12(b)(6), arguing that despite Ofori's many contacts with the United States, neither Section 1981 nor the NYHRL applies to discriminatory conduct that took place outside the territory of the United States.
 
 
 7
 In an Opinion and Order dated September 20, 2005, the District Court concluded that "nothing in the text, structure, or history of Section 1981 indicates that Congress intended it to apply to events outside the territorial jurisdiction of the United States, and it is therefore presumed that Congress did not intend Section 1981 to apply extraterritorially." See Ofori-Tenkorang v. Am. Int'l Group, Inc., No. 05 Civ. 2921, 2005 WL 2280211, at *6 (S.D.N.Y. Sept. 20, 2005). In reaching this conclusion, the District Court adhered to the Supreme Court's teaching in EEOC v. Arabian American Oil Company (Aramco), 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991), that courts must "look to see whether language in the relevant Act gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control," and must adopt the presumption that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." Ofori-Tenkorang, 2005 WL 2280211, at *5 (quoting Aramco, 449 U.S. at 248, 111 S.Ct. 1227).
 
 
 8
 The District Court specifically rejected Ofori's contention that his Section 1981 claims should survive, notwithstanding that most of the allegedly discriminatory acts occurred in South Africa, because the "center of gravity" of his employment relationship with AIG was supposedly in the United States. Noting that in similar contexts "[w]here statutes do not apply extraterritorially, courts have rejected the application of a `balancing of contacts' test to permit U.S. jurisdiction over foreign actions with substantial U.S. contacts," the District Court concluded that "the fact that the alleged discrimination occurred outside the territorial jurisdiction of the United States is fatal to [Ofori's] claim[s]" under Section 1981. Id. at *6-7.
 
 
 9
 Following its decision to dismiss Ofori's Section 1981 claims with prejudice, the District Court declined to exercise supplemental jurisdiction over Ofori's remaining state law claims. See 28 U.S.C. § 1367(c)(3) (permitting a district court to decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction"). Those claims were dismissed without prejudice to their revival in state court.
 
 II. DISCUSSION
 
 10
 We review de novo a district court's decision to grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "accepting as true all facts alleged in the complaint and drawing all inferences in favor of the plaintiff." Twombly, 425 F.3d at 106. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).
 
 
 11
 A. Section 1981 and Employment Discrimination
 
 
 12
 Section 1981 sets forth a remedy for employment discrimination that is independent of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. See Johnson v. Ry. Express Agency, 421 U.S. 454, 459-60, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). Specifically, Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (reproduced ante note 1). In Patterson v. McLean Credit Union, 491 U.S. 164, 174-78, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court read the then-applicable version of Section 1981 to "prohibit[ ] racial discrimination in the making and enforcement of private contracts," id. at 171, 109 S.Ct. 2363 (internal quotation marks omitted), but not to apply to "conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations," id. Section 1981 was not therefore able to reach conduct such as "breach of the terms of the contract or imposition of discriminatory working conditions." Id. at 177, 109 S.Ct. 2363. Partly in response to Patterson, see Lauture v. Int'l Bus. Machs. Corp., 216 F.3d 258, 260 (2d Cir.2000) (citing H.R.Rep. No. 102-40, pt. II, at 2 (1991), reprinted in 1991 U.S.C.C.A.N. 694, 694-95), Congress passed the Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071, which added the language now contained in subsections (b) and (c) of Section 1981. See id. § 101, 105 Stat. at 1071-72.
 
 
 13
 Subsection (c) explicitly applies Section 1981 to private discrimination and subsection (b) explicitly asserts that the term "`make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." Accordingly, to determine whether Ofori's claims fall within the scope of Section 1981, we must assess whether at the time that he allegedly was denied "the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship" on account of his race, 42 U.S.C. § 1981(b), he was, as the statute expressly requires, a "person[ ] within the jurisdiction of the United States," id. § 1981(a).
 
 
 14
 B. Extraterritorial Application of Section 1981
 
 
 15
 In evaluating whether 42 U.S.C. § 1981 applies to Ofori's claims, we begin with the "legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application." Small v. United States, 544 U.S. 385, 388-89, 125 S.Ct. 1752, 161 L.Ed.2d 651 (2005); see also Aramco, 499 U.S. at 248, 111 S.Ct. 1227 ("We assume that Congress legislates against the backdrop of the presumption against extraterritoriality."). "[A]bsent clear evidence of congressional intent to apply a statute beyond our borders, the statute will apply only to the territorial United States." United States v. Gatlin, 216 F.3d 207, 211-12 (2d Cir.2000) (internal quotation marks omitted). We first "look to see whether language in [the relevant Act] gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control." Aramco, 499 U.S. at 248, 111 S.Ct. 1227 (alteration in original). If necessary to ascertain Congress's intent, we may also consider "all available evidence about the meaning of the statute, including its . . . structure[ ] and legislative history." Gatlin, 216 F.3d at 212 (internal quotation marks omitted).
 
 
 16
 The plain text of Section 1981 manifests Congress's intent to confer on "persons within the jurisdiction of the United States . . . the same [enumerated] right[s] in every State and Territory." 42 U.S.C. § 1981(a) (emphases added). Far from evincing any intent on the part of Congress to "apply [the] statute beyond our borders," Gatlin, 216 F.3d at 211, the "language" of Section 1981 unambiguously confirms the opposite. Moreover, nothing in the structure or history of Section 1981 suggests that Congress intended the statute to reach discrimination against individuals outside the territorial jurisdiction of the United States. Instead, as Judge Cote aptly explained,
 
 
 17
 [w]hat was eventually codified as Section 1981 originated in 1866 as part of "a major piece of Reconstruction legislation" in the wake of the Civil War. Runyon v. McCrary, 427 U.S. 160, 168 n. 8, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). See Civil Rights Act of 1866, ch. 31, 14 Stat. 27 (1866). The object of that legislation was to make "all persons born in the United States" citizens of the United States, and to ensure that all citizens retained the same basic rights "in every State and Territory in the United States" as "white citizens" regardless of their "race and color" and "without regard to any previous condition of slavery or involuntary servitude." Civil Rights Act of 1866, ch. 31, sec. 1, 14 Stat. 27, 27 (1866) (emphasis supplied). Ofori-Tenkorang, 2005 WL 2280211, at *5 (footnote omitted).
 
 
 18
 Four years after enacting the Civil Rights Act of 1866,[4] which introduced the provision that would later become Section 1981, Congress re-enacted the provision in the Voting Rights Act of 1870. That statute broadened the scope of the law to cover not merely "all persons born in the United States and not subject to any foreign power,"[5] see Civil Rights Act of 1866, § 1, but rather, "all persons within the jurisdiction of the United States," see Voting Rights Act of 1870, § 16. The 1870 Act also retained the language referring to the provision of equal rights "in every State and Territory in the United States." Id.
 
 
 19
 Like the 1870 version of this statute, Section 1981 limits its application to persons within U.S. territory. The statute not only restricts coverage to conduct taking place in our "State[s]" or "Territor[ies]," but also confines the availability of its protections to "persons within the jurisdiction of the United States."
 
 
 20
 None of our sister circuits has addressed in a published decision whether 42 U.S.C. § 1981 applies extraterritorially, but those district courts that have considered the question have unanimously agreed that the statute does not apply outside the United States. See, e.g., Ortiz-Bou v. Universidad Autonoma de Guadalajara, 382 F.Supp.2d 293, 296-97 (D.P.R.2005); de Lazzari Barbosa v. Merck & Co., No. Civ. 01-CV-2235, 2002 WL 32348281, at * 2 (E.D.Pa. Mar.11, 2002); Mithani v. J.P. Morgan Chase & Co., No. 01 CIV 5928, 2001 WL 1488213, at *1 (S.D.N.Y. Nov.21, 2001); Gantchar v. United Airlines, No. 93 C 1457, 1995 WL 798600, at *2 (N.D.Ill. Apr.21, 1995); Theus v. Pioneer Hi-Bred Int'l, Inc., 738 F.Supp. 1252, 1255 (S.D.Iowa 1990).
 
 
 21
 It is noteworthy that in other contexts where Congress has decided to extend the application of civil rights statutes to cover conduct occurring outside the jurisdiction of the United States, it has done so through explicit legislative amendments. For instance, Section 109 of the Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071, 1077, amended the definition of "employee" for purposes of Title VII and the ADA to provide that "with respect to employment in a foreign country, [the] term includes an individual who is a citizen of the United States." 42 U.S.C. §§ 2000e(f), 12111(4); see also Torrico v. Int'l Bus. Machs. Corp., 213 F.Supp.2d 390, 399 (S.D.N.Y.2002) ("The language of the 1991 amendments to the ADA and Title VII . . . appl[ies] those statutes extraterritorially to U.S. citizens "`with respect to employment in a foreign country' . . . .") (quoting 42 U.S.C. §§ 2000e(f)), 12111(4))). Similarly, in 1984, Congress amended the definition of employee in Section 11(f) of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA"), to "`mak[e] provisions of the [ADEA] apply to citizens of the United States employed in foreign countries by U.S. corporations or their subsidiaries,'" Aramco, 499 U.S. at 259, 111 S.Ct. 1227 (alteration in original) (quoting S.Rep. No. 98-467, at 2 (1984)). See Pub L. No. 98-459, § 802, 98 Stat. 1767, 1792 (1984) (amending the definition of the term "employee" in the ADEA to include "any individual who is a citizen of the United States employed by an employer in a workplace in a foreign country" (codified at 29 U.S.C. § 630(f))).[6]
 
 C. Alleged Discrimination in South Africa
 
 22
 We consider first whether the District Court properly dismissed claims involving alleged discrimination that occurred while Ofori was living and working in South Africa. See, e.g., Compl. ¶ 16 (alleging that, after his transfer to South Africa, Ofori was forced to work in a less desirable office than other South African employees); id. ¶ 18 ("From the time that he began working in South Africa, Ofori [was] . . . singled . . . out for particular scrutiny and ridicule.") (emphasis added); id. ¶ 23 (Ofori received his "only poor performance review" while working in South Africa); id. ¶¶ 25-36 (claiming that Ofori was improperly suspended after having been wrongly accused of stealing from the businessman whose office he shared).
 
 
 23
 Ofori contends with respect to these and all of his allegations that Section 1981 need not be applied extraterritorially in order for him to prevail because under a "center of gravity" test, his employment contract placed him within the jurisdiction of the United States despite the fact that "some of the events" occurred overseas. Br. of Pl.-Appellant ("Pl.'s Br.") at 23, 25. In particular, he claims, inter alia, that the contract was formed in the United States and that the alleged discriminatory acts affecting him while he was overseas were directed by executives at AIG's offices in the United States. See id. at 13-14. Ofori contends that the District Court erroneously declined to engage in a "balancing of contacts" analysis with respect to aspects of his employment relationship having roots or effects within the United States. See id. at 35. He therefore argues that his claims, including those arising out of conduct occurring entirely while he was living and working in South Africa, were improperly dismissed. These arguments are unavailing for several reasons.
 
 
 24
 First, as noted above, the plain text of Section 1981 unambiguously requires that a person be "within the jurisdiction of the United States," 42 U.S.C. § 1981(a), in order to assert rights under the statute. We can find nothing in the statutory language indicating Congress's intent to allow those outside the territorial jurisdiction of the United States to raise Section 1981 claims merely because the relevant employment contract was initially formed in the United States or because the relevant discrimination was directed by persons who were themselves in the United States. Accordingly, we hold that absent a "clear statement," Aramco, 499 U.S. at 258, 111 S.Ct. 1227, of congressional intent to extend coverage "beyond places over which the United States has sovereignty or has some measure of legislative control," id. at 248, 111 S.Ct. 1227 (internal quotation marks omitted), the statute's language providing rights to "persons within the jurisdiction of the United States," 42 U.S.C. § 1981(a), only protects persons within the United States' territorial jurisdiction. See Pfeiffer v. Wm. Wrigley Jr. Co., 755 F.2d 554, 556 (7th Cir.1985) (applying the presumption against extraterritoriality to the ADEA prior to the 1991 amendments, see ante at 302-303, because "[t]he normal basis of national sovereignty is territorial").
 
 
 25
 Second, the mere decision by a defendant in the United States to discriminate against employees abroad cannot serve as the basis for a claim pursuant to Section 1981. The statute prohibits acts of discrimination committed against "persons who are within the jurisdiction of United States," 42 U.S.C. § 1981(a) (emphasis added). See Ortiz-Bou, 382 F.Supp.2d at 296-97 (holding that discriminatory acts that "manifested themselves" in a foreign country are not covered by Section 1981); Theus, 738 F.Supp. at 1253 ("A decision to discriminate [made in the United States] . . . does not create a claim under the civil rights acts—there must be an act." (citing Landrigan v. City of Warwick, 628 F.2d 736, 742 (1st Cir.1980))). Accordingly, Section 1981's territorial limitation is defined by the location of the subject of the discrimination, not by the location of the decisionmaker. We agree with those courts that have held "that an individual, whose primary workstation is abroad, cannot characterize otherwise extraterritorial employment as domestic solely because employment decisions were made . . . in the United States." Shekoyan v. Sibley Int'l Corp., 217 F.Supp.2d 59, 68 (D.D.C. 2002); see also Pfeiffer, 755 F.2d at 559 (holding, before the amendment providing the ADEA with extraterritorial force, see note 2 ante, that an ADEA claim by an American employee against an American employer was properly dismissed because the employee "lived and worked" overseas); DeYoreo v. Bell Helicopter Textron, Inc., 785 F.2d 1282, 1283 (5th Cir.1986) (same). Notwithstanding Ofori's arguments that various decisions concerning his treatment in South Africa were made by executives in the United States and that he "feels the effects of AIG's discrimination against him in the U.S.," Pl.'s Br. at 31, we hold that the actual discriminatory acts that Ofori allegedly experienced while he was living and working in South Africa took place outside the United States. See de Lazzari Barbosa, 2002 WL 32348281, at * 2 ("The key factor in determining the applicability" of Section 1981 to an employee who spends time abroad is "the employee's relevant work station." (internal quotation marks omitted)).
 
 
 26
 Third, the statute's focus on "persons" (as opposed to "contracts" or "employment") "within the jurisdiction of the United States" supports Section 1981's purely domestic application. In particular, we find unpersuasive plaintiff's argument that we should overlook his physical presence outside the United States because the "center of gravity" of his employment contract was in the United States. The cases relied upon by plaintiff in which courts have applied a "center of gravity" analysis have arisen in statutory contexts that did not require personal presence in the United States. In Torrico, for example, the District Court applied the "center of gravity" test to an employment contract to determine whether the plaintiff's work abroad constituted "employment in a foreign country" under the amended ADA. Torrico, 213 F.Supp.2d at 400 (quoting 42 U.S.C. § 12111(4)). Moreover, in In re Maxwell Communication Corp., 186 B.R. 807 (S.D.N.Y.1995), the court conducted a similar analysis in gauging whether a fund "transfer" was domestic or extraterritorial under 11 U.S.C. § 547. Id. at 815-20. In neither case did the statute at issue require that the allegedly aggrieved "person[ ]" be "within the jurisdiction of the United States," 42 U.S.C. § 1981(a).
 
 
 27
 Fourth, we agree with the District Court's conclusion that permitting Section 1981 claims to proceed whenever a plaintiff asserts substantial "contacts" with the United States—even where the conduct of which plaintiff complains occurred while plaintiff was overseas—would greatly expand the scope of Section 1981 in a manner contrary to the statute's plain language. As the Court of Appeals for the Third Circuit concluded in an analogous circumstance involving the extraterritorial application of the National Labor Relations Act ("NLRA"), reliance on a "balancing of contacts" test to determine, as a threshold matter, whether extraterritorial application of the statute is required would effectively "manufacture jurisdiction in the absence of a clearly expressed congressional intent to extend [the statute] to United States citizens temporarily working abroad for a United States employer." Asplundh Tree Expert Co. v. NLRB, 365 F.3d 168, 178 (3d Cir.2004) (declining to adopt the "balance of contacts" test and rejecting the argument that extraterritorial application of the NLRA was proper because there was a U.S.-based "employment relationship" between a U.S. corporation and two of its discharged employees who were on a temporary work assignment in Canada).
 
 
 28
 Finally, we underscore that it is not our role to decide whether 42 U.S.C. § 1981 should, as a matter of public policy, apply extraterritorially to employees of U.S. corporations stationed overseas. We are not free to ignore the clearly-stated purpose of Congress and expand Section 1981 to protect persons outside the "jurisdiction of the United States," no matter how sympathetic these persons or their claims may be.
 
 
 29
 For the foregoing reasons, we decline to adopt a "center of gravity test" or engage in a "balancing of contacts" analysis that would introduce much uncertainty into the law. Cf. Kaczmarek v. Allied Chem. Corp., 836 F.2d 1055, 1057 (7th Cir.1987) (Posner, J.) (noting, in choice of law context, that proponents of "new, flexible standards, such as `interest analysis'" had accorded "too little weight to the virtues of simplicity" and that interest analysis had "caused pervasive uncertainty, higher cost of litigation, [and] more forum shopping"). Instead, the relevant inquiry is whether particular acts of discrimination occurred while plaintiff was "within the jurisdiction of the United States," 42 U.S.C. § 1981(a), or whether they occurred when plaintiff was outside the jurisdiction of the United States and therefore beyond the prescribed reach of Section 1981. The above acts of alleged discrimination that Ofori experienced in South Africa occurred when he was no longer "within the jurisdiction of the United States." 42 U.S.C. § 1981(a). Accordingly, the District Court properly dismissed Ofori's Section 1981 claims insofar as they were predicated on these allegations.
 
 
 30
 D. Alleged Discrimination in the United States
 
 
 31
 We consider next whether the District Court properly dismissed claims involving alleged discrimination that occurred while Ofori was in the United States. Ofori claims, inter alia, that AIG (1) discriminated against him in the "formation" and the "modification" of his employment contract before he left for South Africa, Reply Br. For Pl.-Appellant ("Pl.'s Reply Br.") at 8; Compl. ¶¶ 8, 10; and (2) took action while he was "still physically present in the U.S.," Pl.'s Reply Br. at 13, to segregate him from his white colleagues in South Africa and "arrang[e] for him to work in the office" of a disreputable South African businessman, Compl. ¶¶ 8-12, 16-17.[7]
 
 
 32
 Applying the foregoing analysis of the statute's wording and history, we conclude that the District Court improperly dismissed plaintiff's Section 1981 claims insofar as they relate to these allegations. In categorically concluding that "the alleged discrimination occurred outside the territorial jurisdiction of the United States," the District Court did not take account of plaintiff's allegation that he was present in the United States when these particular acts of alleged discrimination occurred. Conduct that occurred while plaintiff was within the United States clearly satisfies the statute's requirement that a person be "within the jurisdiction of the United States," 42 U.S.C. § 1981(a), and therefore may serve as the basis for a claim under Section 1981 that plaintiff was not afforded the "same right [as white citizens] within [a] State [or] Territory" to "make and enforce" his employment contract, id. In the circumstances presented here, a reasonable jury might conclude that AIG's alleged decision to relocate Ofori to South Africa to work in unfavorable conditions amounted to racial discrimination while Ofori was still "within the jurisdiction of the United States."[8] 42 U.S.C. § 1981(a).
 
 
 33
 In addition, Ofori alleged that "[i]n December 2003, [he] was told that he would not receive a bonus from AIG for the work that he had performed for AIG in 2003," and that he subsequently received a bonus only one-sixth of the amount he received in 2002. Compl. ¶ 24. There is no dispute that Ofori was living in South Africa in December 2003, and he has not alleged any specific discriminatory act relating to the bonus that occurred before then. At oral argument, Ofori's counsel contended that because the bonus was meant to reward performance for all of 2003, much of which Ofori spent living and working in the United States, the awarding of a diminished year-end bonus was necessarily an act of alleged discrimination that occurred in the United States. We disagree. In the absence of evidence of a relevant discriminatory action taken against Ofori before his work location changed to South Africa, he would not be able to recover under Section 1981 for the allegedly discriminatory bonus decision. Nevertheless, because Ofori was living and working in the United States for most of the period that the bonus was intended to cover, it is reasonable to infer that a discriminatory act with respect to the bonus may have been taken against him while he was still in the United States. Since all reasonable inferences must be drawn in Ofori's favor at this preliminary stage of the litigation, see Twombly, 425 F.3d at 106, the District Court should not have dismissed his Section 1981 claims insofar as he alleges that the decision to award him a diminished bonus constituted racial discrimination while he was still in the United States. See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir.2004) ("At the pleading stage . . . the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.") (internal quotation marks omitted).
 
 
 34
 Accordingly, we vacate the District Court's dismissal of Ofori's claims insofar as they assert discrimination relating to (1) Ofori's initial assignment overseas, including any preparations or arrangements made in the United States before his departure, and (2) the bonus he received for 2003.
 
 III. CONCLUSION
 To summarize: We hold that
 
 35
 (1) Congress has not extended Section 1981 to apply to claims arising from discrimination that occurred while a plaintiff was not "within the jurisdiction of the United States," 42 U.S.C. § 1981(a);
 
 
 36
 (2) the District Court properly dismissed plaintiff's Section 1981 claims insofar as they seek recovery for alleged discriminatory acts that occurred while he was living and working in South Africa; and
 
 
 37
 (3) the District Court erred in dismissing plaintiff's Section 1981 claims insofar as they seek recovery for alleged discriminatory acts that occurred while he was in the United States.
 
 
 38
 * * * *
 
 
 39
 We thus affirm in part and vacate in part the judgment of the District Court and remand the cause for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 42 U.S.C. § 1981 reads as follows:
 (a) Statement of equal rights
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 (b) "Make and enforce contracts" defined For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
 (c) Protection against impairment
 The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.
 
 
 [2]
 Both Title VII, 42 U.S.C. § 2000eet seq., and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., provide, in pertinent part, that "[w]ith respect to employment in a foreign country, [the term `employee'] includes an individual who is a citizen of the United States." 42 U.S.C. §§ 2000e(f), 12111(4). Similarly, the Age Discrimination in Employment Act of 1967 provides that "the term `employee' includes any individual who is a citizen of the United States employed by an employer in a workplace in a foreign country," 29 U.S.C. § 630(f).
 
 
 [3]
 See Civil Rights Act of 1991, Pub.L. No. 102-166, § 109, 105 Stat. 1071, 1077 (codified at 42 U.S.C. §§ 2000e-1(c), 12111(4), 12112(c)) (amending Title VII and the ADA to include the provisions reproduced ante note 1); Pub L. No. 98-459, § 802, 98 Stat. 1767, 1792 (1984) (codified at 29 U.S.C. §§ 630(f), 623(h)) (amending the ADEA to include the provision reproduced ante note 1).
 
 
 [4]
 Section 1 of the Civil Rights Act of 1866 states, in relevant part, that
 all persons born in the United States and not subject to any foreign power . . . are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude . . . shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.
 Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27 (emphasis added).
 
 
 [5]
 Section 16 of the Voting Rights Act of 1870 states, in relevant part, that
 all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding.
 Voting Rights Act of 1870, ch. 114, § 16, 16 Stat. 140, 144 (emphasis added).
 
 
 [6]
 Congress limited the extraterritorial force of Title VII, the ADA and the ADEA by providing that (1) with respect to an expatriate U.S. citizen employee, actions of employers that would otherwise be unlawful are not unlawful if compliance with the relevant statute would cause the employer to violate the laws of the country in which the employee works,see 42 U.S.C. §§ 2000e-1(b), 12112(c)(1); 29 U.S.C. § 623(f)(1); and (2) these statutes do not apply to the foreign operations of a foreign corporation unless the corporation is "controlled" by a U.S. employer, see 42 U.S.C. §§ 2000e-1(c)(2), 12112(c)(2); 29 U.S.C. § 623(h)(2).
 
 
 [7]
 In his reply brief Ofori contends that the decision to segregate him from other white colleagues was made while he was still working in the United States. While certain paragraphs of the complaint support this assertion,see Compl. ¶ 17 ("Before he began working in the office of the businessman, Ofori discovered that the businessman had been implicated in a number of questionable business deals . . ."), other paragraphs suggest that the decision was made after Ofori arrived in South Africa, see Compl. ¶ 16 ("When AIG transferred Ofori to South Africa, Cassano and Jones decided that Ofori would not work in the main office in Johannesburg."). Construing all allegations in the light most favorable to Ofori, see Makarova v. United States, 201 F.3d 110, 113 (2d Cir.2000), we assume for the purposes of this motion, that the decision to segregate Ofori from other AIG employees was made while Ofori was still in the United States. Nevertheless, we highlight this apparent ambiguity, which we assume the parties will resolve during discovery.
 
 
 [8]
 Although Ofori's complaint appears to allege that the decision to send him to South Africa was partially finalized or confirmed while he was in London "en route from New York to Johannesburg on a business trip,"see Compl. ¶¶ 9, 15, the complaint also suggests that the decision to transfer him to South Africa had already been made before he arrived in London, see id. (alleging that "[AIG executives] Cassano and Jones agreed with Ofori's impending temporary relocation to South Africa) (emphasis added). The facts alleged in the complaint thus indicate that the decision to send Ofori abroad was made while he was "within the jurisdiction of the United States." Accordingly, we need not decide here whether alleged discrimination that occurs while a plaintiff who resides and works in the United States happens to be traveling abroad can support a claim under Section 1981. Cf. Torrico, 213 F.Supp.2d at 403 ("[It] appears obvious in the case of a two-week business trip abroad . . . that the employee's place of employment is the United States and that an employer cannot evade the application of the antidiscrimination laws."); de Lazzari Barbosa, 2002 WL 32348281, at *7 (holding that "[t]he key factor in determining the applicability" of Section 1981 to an employee who spends time abroad is "the relevant work station") (quotation marks omitted).